**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
ALEXANDRIA DIVISION

| | |
|---|---|
| IN RE SPIRE GLOBAL, INC., SECURITIES LITIGATION, | Case No. 1:24-CV-1458-MSN-WEF |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.   NATURE OF THE ACTION AND OVERVIEW ..............................................................1

II.  JURISDICTION AND VENUE ....................................................................................3

III. PARTIES .................................................................................................................3

IV.  SUBSTANTIVE ALLEGATIONS ...............................................................................4

    A.   Overview Of The Business ..............................................................................4

    B.   Space Services' Profitability Was Material To Investors .....................................6

    C.   Throughout The Class Period, The Company Touted Its Revenue Growth And Profitability ..............................................................................................8

    D.   Spire Reveals It Incorrectly Recognized Revenue Upon Completion of Pre-Space Activities Before Delivering Data And The "Removal" Of Its CEO From His Position ........................................................................................9

    E.   Spire's Financial Results Were Not Presented In Accordance With GAAP .........14

        1.   "Pre-Space" Activities ...........................................................................15

        2.   Research & Development Costs ................................................................16

V.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ..............................................................................................18

    A.   Revenue And Gross Margin Results ..............................................................18

    B.   Revenue Recognition Practices .....................................................................24

    C.   Cost of Revenue .........................................................................................27

    D.   Costs of Research and Development ...............................................................33

    E.   Gross Margins ...........................................................................................37

    F.   The Company's Internal Controls Over Financial Reporting ..............................41

VI.  LOSS CAUSATION .................................................................................................44

VII. ADDITIONAL SCIENTER ALLEGATIONS ...............................................................45

    A.   That The Revenue At Issue Involved The Company's Core Business Supports A Finding Of Scienter ...................................................................46

    B.   The Removal Of The Company's Executive Amid The Revenue Re-Evaluation And Announcement That The Financial Results Could No Longer Be Relied On Supports Scienter ........................................................47

    C.   The Company's Admission That It Completely Lacked  Internal Controls Throughout The Class Period Supports A Finding Of Scienter ..........................47

    D.   Corporate Scienter .....................................................................................48

VIII. CLASS ACTION ALLEGATIONS .............................................................................49

IX.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET DOCTRINE) ..................................................................................................... 50

X.  UNDISCLOSED ADVERSE FACTS ............................................................................. 52

XI.  NO SAFE HARBOR ....................................................................................................... 53

XII.  CLAIMS FOR RELIEF ................................................................................................... 54

XIII.  PRAYER FOR RELIEF ................................................................................................... 58

XIV.  JURY TRIAL DEMANDED ........................................................................................... 59

Lead Plaintiff Michal Bousso ("Bousso" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Spire Global, Inc. ("Spire" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Spire; and (c) review of other publicly available information concerning Spire.

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Spire securities between May 11, 2022 and August 14, 2024, inclusive (the "Class Period"), and were damaged thereby.  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Spire is a satellite company with a constellation of satellites that delivers data to customers for a variety of applications, such as providing weather and map information.  It collects that data once and then can sell it an unlimited number of times to any and all customers.

3.       According to the Company, during the Class Period, Spire was achieving strong revenue growth and healthy gross margins due to its existing space infrastructure.  However, this was not accurate because the Company had failed to disclose that it was prematurely recognizing revenue on Space Services contracts and that the costs associated with certain contracts were improperly characterized as research and development expenses.

4.      Specifically, under relevant Generally Accepted Accounting Principles ("GAAP") the Company was only supposed to recognize revenue upon delivery of data to its customers. Yet,

the Company was recognizing revenue upon completion of certain pre-space mission activity, which was improper because delivery of data is the only distinct performance obligation in Spire's contracts. Similarly, the Company's margins were inflated by improperly characterizing the costs of certain contracts as research and development expenses, when they should have been recorded as costs of revenue. Unsurprisingly, the Company was also forced to ultimately disclose that it had additional material weaknesses in its internal control over financial reporting.

5. Upon the disclosure of these improper accounting practices, Spire's stock price fell sharply. Specifically, on August 14, 2024, after the market closed, the Company disclosed it was "reviewing its accounting practices and procedures with respect to revenue recognition" regarding certain Space Services contracts and "related internal control matters." The Company further disclosed the "type of Contracts that the Company has identified for re-evaluation resulted in recognized revenue of $10 to $15 million on an annual basis" and "additional financial measures such as gross profit could also be impacted." On this news, the Company's share price fell $3.41 or 33.56%, to close at $6.75 per share on August 15, 2024, on unusually heavy trading volume.

6. Thereafter, the Company provided additional information about the need to restate its financial results and why prior financial results were incorrect. On August 27, 2024, the Company announced that investors should no longer rely on its previously issued financial statements during the Class Period as such financial statements would need to be restated. And then on November 4, 2024, the Company disclosed that the costs associated with certain contracts would be reclassified from "research and development" to "cost of revenue," which would directly impact profitability measures such as gross margin.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

8.      This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

9.      This Court has subject-matter jurisdiction over this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District. In addition, the Company's principal executive offices are in this District.

11.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.     PARTIES

12.     Lead Plaintiff Michal Bousso, as set forth in the previously filed certification (ECF No. 17), incorporated by reference herein, purchased Spire common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged below.

13.     Defendant Spire is incorporated under the laws of Delaware with its principal executive offices located in Vienna, Virginia. Spire's common stock trades on the New York Stock Exchange under the symbol "SPIR."

14.     Defendant Peter Platzer ("Platzer") was the Company's Chief Executive Officer ("CEO") at all relevant times. Platzer was removed as CEO effective January 1, 2024.

15.     Defendant Thomas Krywe ("Krywe") was the Company's Chief Financial Officer ("CFO") until September 5, 2023.

16.     Defendant Leonardo Basola ("Basola") has been the Company's CFO since September 5, 2023.

17.     Defendants Platzer, Krywe, and Basola (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged below to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified below had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded below.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Overview Of The Business

18.     Spire owns and operates one of the world's largest multi-purpose satellite constellations in low earth orbit.  According to the Company, each satellite collects a variety of

radio frequency signals which have numerous practical applications, such as geolocation for large ocean faring shipping vessels, navigation for commercial aviation, and advanced weather forecasting. The Company claims that it processes this vast trove of data into useful data analytics (or "solutions") and then provides customers these solutions through a direct link with an application programming interface ("API") infrastructure. The end-user can then integrate that data into their operations as needed.

19.     According to the Company, to create its proprietary data analytics solutions, the Company's satellite constellation and its cloud-based data infrastructure process five terabytes of data each day on average. Spire "collect[s] this data once and can then sell it an unlimited number of times . . . with global coverage, real-time and near real-time data that can be easily integrated into [the] customers' operations."

20.     Spire targets and services a wide range of industries, including agriculture, logistics, financial services, insurance, energy, and real estate. The largest industries targeted and served by Spire are maritime, aviation, and government (civil and defense). Specifically, Spire provides data for ship/aircraft monitoring, ship/aircraft safety, route optimization, and weather forecasting.

21.     The Company also offers Space Services ("space-as-a-service"), which is an end-to-end offering that leverages Spire's existing operational infrastructure to deploy customers' own applications and sensors into space. Space Services encompasses: (i) Software in Space, which deploys customer software to existing satellites without the need to develop and launch dedicated spacecraft; (ii) Payload in Space, which hosts customer payloads on a fully integrated space, ground, and web platform; (iii) Solution in Space, wherein customers partner with Spire to build a custom end-to-end solution from payload development to mission operations; and (iv) Operation

in Space, where customers access Spire's ground infrastructure and APIs to operate their existing or future satellites.

22.     The Company claims that it derives revenue from providing data, insights and access to its cloud-based technology platform.  Subscription periods for its solutions contracts generally range from one to two years and are typically non-cancelable, with subscription fees typically billed either monthly or quarterly in advance. The Company states that under some contracts it provides multiple project-based services to a customer, most commonly when a contract covers multiple phases of the Space Services solution (e.g., development, manufacturing, launch and satellite operations).

23.     Historically, three government customers account for a substantial portion of the Company's revenue. For fiscal 2021, contracts with federal, state, local, and foreign governments accounted for approximately 55% of reported revenue, and three customers generated approximately 67% of the revenue reported in the government channel. For fiscal 2022, government contracts accounted for approximately 34% of reported revenue, and three customers generated approximately 69% of the revenue reported in the government channel. For fiscal 2023, government contracts accounted for approximately 42% of reported revenue, and three customers generated approximately 63% of the revenue reported in the government channel.

**B.      Space Services' Profitability Was Material To Investors**

24.     Gross margin is a profitability measure that was closely followed by analysts and investors. Gross profit is net sales less the cost of goods sold; it includes variable costs but not fixed costs. Gross margin is a percentage calculating by dividing gross profit by net sales; it represents the percentage of sales revenue that a company is able to convert into gross profit, so it assesses how efficiently a company generates profit from sales.

25.     Defendants did not break out Space Services from its other business segments because they were all "subscription-based contracts." For example, during the first quarter 2022 earnings call held on May 11, 2022 (the "1Q22 Earnings Call"), an analyst asked management to give "some sense" of Space Services revenue because it "does seem to be a fairly different flavor of revenue." Defendant Platzer refused, asserting that "*we can't really break it out, because it is a shared infrastructure*." Even though the contracts are distinct, Defendant Platzer stated that Space Services is still "*a subscription business, just like our other businesses that is focused on delivering our customer's data, just like our other businesses.*"

26.     As a result, analysts understood that Space Services was a subscription-based business, meaning that Spire recognized revenue as data was provided to the customer. For example, on October 22, 2022, Credit Suisse published an analyst report entitled "Space: Searching for Gross Profit Dollars." In its discussion about Spire, Credit Suisse stated that, in Space Services, "the company categorizes revenue as SaaS subscription revenue -- in-line with the rest of the business," despite "diverging traits" such as "hard dollar incremental COGS associated with building and launching satellites for the customer."

27.     Throughout the Class Period, analysts focused on growth driven by Space Services. For example, on November 11, 2022 Credit Suisse "note[d] that *Spire has by far the highest gross margins within our Space coverage*, which should support the path to FCF breakeven and an attractive long-term model." On March 9, 2023, a Canaccord Genuity report noted that the "the company's LEMUR fleet utilization continues to improve, and the business still has 33% 2023 growth expectations, *largely driven by Space Services* (bespoke satellite production)."

7

**C.      Throughout The Class Period, The Company Touted Its Revenue Growth And Profitability**

28.      Throughout the Class Period, Defendants reported strong revenue growth and profitability. For example, at the start of the Class Period, on May 11, 2022, Spire announced its first quarter 2022 financial results in a press release, claiming "revenue grew 86% year-over-year." On August 8, 2022, the Company reported second quarter 2022 financial results in a press release, stating revenue grew 113% year-over-year. On November 9, 2022, the Company reported its third quarter 2022 financial results in a press release, stating that revenue grew 114% year-over-year. Similarly, on March 8, 2023, the Company reported fourth quarter revenue grew 49% year-over-year in a press release which quoted Defendant Platzer attributing the Company's success to its "total addressable market approaching $100 billion across our maritime, aviation, weather, and space services solutions, a subscription-based business model, and a focus towards profitability." Then, on May 10, 2023, the Company reported first quarter 2023 financial results in a press release, reporting revenue increased 34% year-over-year to a record $24.2 million. In an earnings call held on the same day, Defendant Platzer touted that "margins took another step forward, as we continue on our journey to profitability."

29.      Defendants also touted their ability to control costs. On August 9, 2023, the Company reported second quarter 2023 financial results in a press release, which touted "revenue increased 37% year-over-year to a record $26.5 million*"* and claimed that the Company's *"gross margin improvement demonstrates our success in leveraging headcount and infrastructure costs across our four solutions."*

30.      Analysts took note of Spire's profitability, which was better than its peers'. For example, on August 10, 2023, Canaccord Genuity published an analyst report recognizing that *"[p]erhaps the most important story of the quarter was SPIR's gross margin, which vaulted up*

*1,300 bp y/y and 650 bp sequentially to an impressive 63.6% on a GAAP basis.*" The analyst report concluded that the research firm saw Spire as "undervalued relative to satellite operator and manufacturer/solution provider peers in space, *especially considering the impressive gross margins which are starting to mirror a SaaS business model.*"

31.     According to Defendants, these impressive results were possible because customer billings funded pre-space mission activities. As Defendant Basola explained on a November 8 2023 earnings call, "*pre-space CapEx is largely funded by customer billings*," such that "over the pre-space portion of the deal, *we are paid for what we spend*" and "we capitalize all non-R&D expenses of pre-space as fixed assets, or PP&E." Likewise, on March 6, 2024, Defendant Platzer stated during an earnings call that: "*our high gross margins and growth rates are not just numbers, they are a reflection of an innovative business model,* and designed for resilience and long term financial health *given that all our products are sold as a subscription*."

32.     However, all of this purported revenue growth and strong margins were highly misleading because the Company had failed to disclose that it was improperly recognizing revenue on Space Services contracts prematurely and that the costs associated with certain contracts were improperly characterized as research and development expenses.

**D.     Spire Reveals It Incorrectly Recognized Revenue Upon Completion of Pre-Space Activities Before Delivering Data And The "Removal" Of Its CEO From His Position**

33.     On August 14, 2024, after the market closed, Spire announced it would be unable to timely file its second quarter 2024 financial report as the Company was "reviewing its accounting practices and procedures with respect to revenue recognition" regarding certain Space Services contracts. Specifically, the ongoing review related to "the potential existence of embedded leases" and "revenue for pre-space mission activities." The contracts at-issue had "resulted in recognized revenue of $10 to $15 million on an annual basis." Moreover, "additional

financial measures such as gross profit could also be impacted," and the Company was evaluating "related internal control matters." Specifically, in a Form 12b-25 filed with the SEC, the Company stated, in relevant part:

> Spire Global, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2024 (the "Quarterly Report") within the prescribed time period without unreasonable effort and expense. The ***Company is in the process of reviewing its accounting practices and procedures with respect to revenue recognition related to certain contracts in its "Space as a Service" business (the "Contracts") under applicable accounting standards and guidance. The re-evaluation relates to the potential existence of embedded leases of identifiable assets in the Contracts and the related recognition of revenue for pre-space mission activities. The Company is also considering any related internal control matters associated with the Contracts.*** Due to this ongoing review, the preparation of the Company's condensed consolidated financial statements as of June 30, 2024 and for the three and six months ended June 30, 2024, will require additional time to complete. Depending upon the results of this review, the Company may be required to restate or revise its previously issued financial statements.
>
>                             \*      \*      \*
>
> While the Company's review is ongoing, at the time of filing this report, the type of Contracts that the Company has ***identified for re-evaluation resulted in recognized revenue of approximately $10 to $15 million on an annual basis***. Depending on the results of the review, additional financial measures such as gross profit could also be impacted. However, the Company believes that the re-evaluation of its revenue recognition for these Contracts will not impact the Company's statements of cash flows for any period.

34.     On this news, the Company's share price fell $3.41 or 33.56%, to close at $6.75 per share on August 15, 2024, on unusually heavy trading volume.

35.      Then, after the market closed on August 27, 2024, the Company announced that investors should no longer rely on its previously issued periodic financial statements since the quarter ended March 31, 2022, because "revenue and cost recognition timing for pre-space mission activities was incorrect." As the Company explained, Spire would restate it financials to remove certain "pre-space mission activity revenue" from the periods it was recognized in and instead

"record that revenue over the period in which data is delivered."  As the Company explained in a

Form 8-K filed with the SEC:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> As previously disclosed in the Company's Form 12b-25 filed with the SEC on August 14, 2024, the Company has been reviewing its accounting practices and procedures with respect to revenue recognition related to certain contracts in its "Space as a Service" business (the "Contracts") under applicable accounting standards and guidance. The Company has retained technical accounting experts to help examine and make recommendations regarding the potential existence of embedded leases of identifiable assets in the Contracts and the recognition of revenue and related costs for pre-space mission activities under such Contracts.
>
> The Company is reviewing the potential existence of embedded leases of identifiable assets in the Contracts at this time. ***Separately from this ongoing review, the Company has determined that its accounting for these Contracts, including primarily revenue and cost recognition timing for pre-space mission activities, was incorrect and that certain previously issued financial statements need to be restated to remove certain previously recorded pre-space mission activity revenue from the period in which pre-space mission activities were performed under the Contracts, and instead, record that revenue over the period in which data is delivered.*** As a result of this determination and the ongoing review of the item disclosed above, the preparation of the Company's condensed consolidated financial statements as of June 30, 2024 and for the three and six months ended June 30, 2024, will require additional time to complete.
>
> In connection with this evaluation, on August 23, 2024, the audit committee of the board of directors of the Company, after discussion with the Company's management and with PricewaterhouseCoopers LLP ("PwC"), concluded that the following should no longer be relied upon: (a) the Company's previously issued unaudited condensed consolidated financial statements as of and for (i) the quarters and nine months ended September 30, 2023 and 2022, (ii) the quarters and six months ended June 30, 2023 and 2022, and (iii) the quarters ended March 31, 2024, 2023 and 2022, and (b) the Company's previously issued audited consolidated financial statements as of and for the years ended December 31, 2023 and 2022 (collectively, the "Affected Periods"), filed with the SEC in the respective Quarterly Reports on Form 10-Q for such quarterly periods (the "Form 10-Qs") and in the Annual Reports on Form 10-K (the "Form 10-Ks") for such years and included in any reports, related earnings releases, investor presentations or similar communications of the Company's financial results. Based on its review of the Affected Periods to date, the Company plans to restate its consolidated financial statements for the Affected Periods and include them in one or more amended periodic reports (the "Amended Filings") to be filed with the SEC. The Company is working to complete its review and such restatements as soon as practicable and

currently expects to be able to file the Amended Filings and the Q2 2024 Form 10-Q within the six-month period provided by the NYSE.

In addition, the Company's management is in the process of evaluating whether the matter discussed above will result in the identification of additional material weaknesses in the Company's internal control over financial reporting. Management's conclusions regarding the impacts of the matter discussed above on the Company's internal control over financial reporting will be included in the Amended Filings.

While the Company's review is ongoing, at the time of filing this Current Report on Form 8-K, the type of Contracts that the Company has identified for re-evaluation and restatement resulted in recognized revenue currently estimated to be $10 to $15 million on an annual basis. Depending on the results of the review, additional financial measures such as gross profit could also be impacted. However, the Company believes that the restatement of its revenue recognition for these Contracts will not impact the Company's overall cash flows for any period.

36.     Despite the Company's estimate of the revenue affected by the announced restatement of financials, analysts stated they would stay on the sidelines until the actual magnitude of the restatement was disclosed. As an August 27, 2024, Canaccord Genuity Capital Markets report explained, "[a]t this time, there is simply not enough information available on the outcome of the audit and corresponding 2024 expectations to revise our model."

37.     On November 4, 2024, after the market closed, the Company filed another Form 12b-25, disclosing yet another basis for the need to restate its financials.  Therein, the Company had explained that it had "initiated a review of certain research and development contracts, including technology developments that are funded or co-funded by government agencies." The Company also announced that it had "concluded that its previous revenue recognition practice, which was upon the completion of each contractual milestone in the amount prescribed in the contract for that milestone, was not a good representation of the pattern of control transfer for the related intellectual property."  Moreover, the Company disclosed that "the full costs associated with the R&D Contracts will be reclassified from 'research and development' to 'cost of revenue'

within gross profit on the face of the consolidated statements of operations." Specifically, the

Company stated:

> As previously disclosed, the Company determined that its accounting practices and procedures with respect to revenue recognition related to certain Space Services contracts should be restated. ***Previously, the Company identified two performance obligations in these contracts: a pre-space performance obligation for asset design, manufacturing, and launch; and a second performance obligation related to data provision during the operation of the satellite. After re-evaluating the contractual terms, the Company concluded data provision is the only distinct performance obligation in these contracts.*** The Company will restate certain previously issued financial statements to remove certain previously recorded pre-space mission activity revenue from the period in which pre-space mission activities were performed under the contracts, and instead, record that revenue over the period in which data is delivered, which begins on the commissioning of a satellite and ends at the termination of a contract or the decommissioning of the satellite, whichever occurs first.
>
> Separately, the Company recently initiated a review of certain research and development contracts, including technology developments that are funded or co-funded by government agencies (the "R&D Contracts," and together with the Space Contracts, the "Contracts"). The Company has concluded that its previous revenue recognition practice, which was upon the completion of each contractual milestone in the amount prescribed in the contract for that milestone, was not a good representation of the pattern of control transfer for the related intellectual property. Instead, the Company will use a percentage-of-completion methodology, generally resulting in earlier revenue recognition, as the Company's performance precedes the related milestone. ***Additionally, the full costs associated with the R&D Contracts will be reclassified from "research and development" to "cost of revenue" within gross profit on the face of the consolidated statements of operations. In the past, these costs were fully accounted for as part of "research and development" within operating expenses.*** The Company is in the process of quantifying the amount of the corrections to revenue recognition and classification of related costs for the changes in its accounting policies, which will be included in the restatements of the previously issued financial statements for the Affected Periods, and to implement these changes for its financial statements for the three and six months ended June 30, 2024 and the three and nine months ended September 30, 2024.

38.    Additionally in the same November 4, 2024 Form 12b-25, Spire revealed that there

were material weaknesses in its internal control over financial reporting, stating:

> As a result of this matter, the Company expects to identify one or more material weaknesses. Due to these reviews and the application of the associated accounting treatment changes, the preparation of the Company's condensed consolidated

financial statements as of September 30, 2024 and for the three and nine months ended September 30, 2024, will require additional time to complete.

39.     And the Company further disclosed that, upon further investigation, "***most***" of its satellites do not qualify for embedded lease treatment.

> The Company also reevaluated whether the Space Contracts contain embedded leases, and based on this review, the Company has concluded that most of its satellites do not qualify for embedded lease treatment.

40.     On November 14, 2024, Craig-Hallum Capital Group published an analyst report, which estimated that "We Expect Restatement Will Reduce FY'24 Revenue By ~$10M." The report also discussed that following the disclosures the Company "will not be able to recognize revenue during design/construction, with data provision after satellite launch determined to be the 'only distinct performance obligation.'" The report concluded that "***In our view, FY'24 was on track for ~$25M in pre-space revenue, of which we believe a substantive portion after restatement will not be able to recognized.***"

41.     On December 3, 2024, pre-market, Spire issued a press release announcing that Defendant Platzer was removed as CEO and Defendant Basola would resign as CFO "once the Company completes its previously disclosed revenue of certain accounting practices and the related restatement of prior period financial statements."

42.     The truth about Spire's financial statements has yet to fully emerge because the Company has not yet filed its restatement.

### E.     Spire's Financial Results Were Not Presented In Accordance With GAAP

43.     Under SEC Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Accounting Standards Codification

("ASC") are promulgated by the Financial Accounting Standards Board ("FASB") as the source of authoritative GAAP for nongovernmental entities.

44.     Spire's disclosure that financial statements since the quarter ended March 31, 2022 should not be relied upon is an admission that they were false and misleading when originally issued. *See* Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25.

### 1.     "Pre-Space" Activities

45.     ASC 606 is an accounting standard that governs the recognition of revenue from contracts with customers. It was promulgated by the FASB in 2014 to improve the financial reporting of revenue and to allow topline financial statements to be compared. The "core principle" of ASC 606 "is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." In accordance with that principle, revenue is recognized using a 5-step process: (i) identify the contract(s) with the customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. ASC 606-10-05-4.

46.     Specifically, step 2 of revenue recognition is to identify Spire's "distinct" obligations so that the transaction price can be allocated to each of those performance obligations:

> Step 2: Identify the performance obligations in the contract—A contract includes promises to transfer goods or services to a customer. If those goods or services are distinct, the promises are performance obligations and are accounted for separately. ***A good or service is distinct if the customer can benefit from the good or service on its own or together with other resources that are readily available to the customer*** and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract.

ASC 606-10-05-4.

47.     However, preparatory activities that enable Spire to perform its contract are not distinct performance obligations. According to ASC 606-10-25-7:

> ***Promised goods or services do not include activities that an entity must undertake to fulfill a contract unless those activities transfer a good or service to a customer.*** For example, a services provider may need to perform various administrative tasks to set up a contract. The performance of those tasks does not transfer a service to the customer as the tasks are performed. Therefore, those setup activities are not promised goods or services in the contract with the customer.

48.     Thus, Spire cannot recognize revenue from "pre-space mission activities" associated with Space Services contracts. Any pre-space mission activities that Spire conducts are simply preparatory work to allow the Company to deliver space data to the customer. Even in Space Services contracts where Spire builds a custom end-to-end solution, that is not a distinct performance obligation because the customer cannot benefit from it without Spire's ground infrastructure and APIs.

### 2.     Research & Development Costs

49.     ASC 730 governs the accounting and reporting of research and development costs. ASC 730-10-05-2 states that the future benefits "are at best uncertain" and "there is no indication that an economic resource has been created." This means that the research and development costs cannot be matched with revenue. *See* ASC 730-10-05-3. As a result, research and development costs are incurred as expenses.

50.     However, ASC 730 does not apply to "costs of research and development activities conducted for others under a contractual arrangement." ASC 730-10-15-4.

51.     Costs related to a contractual arrangement must be recognized as costs of revenue, not research and development. ASC 340-40-25-7. Direct labor and materials, costs that are explicitly chargeable to the customer under the contract, and allocation of costs that are directly

related to the contract (such as insurance, depreciation of tools, etc.) are not research and development costs. *Id.* These must be recognized as cost of revenue.

52.     Spire failed to recognize costs associated with research and development contracts as costs of revenue. This was improper because there was a contractual arrangement and the costs relate to that contractual arrangement. As a result, Spire understated costs of revenue, thereby overstating gross margin.

53.     In fact, a former employee confirmed that Defendants were improperly excluding costs from research and development contracts from costs of revenue. According to Former Employee 1 ("FE1")[1], he[2] received an email from Financial Planning and Analysis instructing the Accounts Payable department to record expenses as R&D, not as cost of goods sold. This was improper because expenses for contracts were not coded to be related to a specific project, and they were not related to R&D.  FE1 stated he saw numerous "red flags" with how expenses were recorded, and "the way they were processing information. They didn't enter expenses in a way that would have been able to work." FE1 described how there was no way to verify expenses; "They'd be telling us, 'There's $50,000 already spent on this for the software developer labor.'" But FE1, whose responsibilities included reconciling expenses and contracts, had no avenue to locate a contract to confirm the amount. FE1 described one instance where he received an email instructing Accounts Payable to record a bill for a $100,000.00 piece of satellite testing equipment as R&D. FE1 said the explanation he received about why it was coded as an R&D expense was

---

[1] FE1 was employed by Spire as a Senior Accountant from December 2022 to June 2023. FE1's managers included Chief Accounting Officer, Thomas Lim. Thomas Lim in turn reported to Defendant Krywe and Defendant Platzer. FE1 also worked closely with Mike Crabill, the Director of Financial Planning and Analysis, who in turn reported to Defendant Krywe and Defendant Platzer.
[2] The former employee is defined using the masculine pronoun to protect their anonymity.

that it was being used to "research a new sales opportunity." This explanation did not make sense to FE1 because "they had already sold" the satellite and "every single person on this finance and accounting team knew that."  FE1 stated this method was not accurate, that it affected "accounting for revenue." FE1 stated that he concluded that miscoding to R&D was routinely done intentionally to make gross profit look bigger and the instance of the $100,000.00 piece of equipment was "not a one-off. It was a smaller one from what they were doing."

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Revenue And Gross Margin Results

54.     On May 11, 2022, Spire published a press release announcing its financial results for the quarter ended March 31, 2022. The press release was also filed with the SEC on May 11, 2022 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its first fiscal quarter financial highlights, stating in relevant part:

> First quarter 2022 revenue increased 86% year over year to $18.1 million, which topped the high end of our guidance of $17.5 million, and was driven by increased adoption by existing customers and recent new customer additions.

55.     Later on May 11, 2022, the Company held an earnings call to discuss the Company's first quarter 2022 financial results. During the earnings call, Defendant Krywe reiterated the Company's purportedly successful financial results, and emphasized the results were driven by Space Services. Specifically, Defendant Krywe stated, in relevant part:

> *Q1 revenue increased 86% year-over-year to $18.1 million*, which topped the high end of our guidance of $17.5 million and was driven by increased adoption of our solutions by existing customers and recent new customer additions. *ARR at quarter end was $81.6 million up 134% year-over-year*, which also exceeded the top end of our guidance *and was driven by key wins in weather and space services*.

56.     On August 10, 2022, Spire issued a press release announcing its financial results for the quarter ended June 30, 2022. The press release was also filed with the SEC on August 10,

2022 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release the Company

reported its second fiscal quarter financial highlights, stating in relevant part:

> **Second quarter 2022 revenue increased 113% year-over-year to $19.4 million,** which topped the high end of our guidance of $19.2 million, and was driven by increased adoption by existing customers and recent new customer additions.

57.     Later on August 10, 2022, the Company held an earnings call to discuss the

Company's second quarter 2022 financial results. During the earnings call, Defendant Krywe

reiterated the Company's purportedly successful financial results, and emphasized the results were

driven by Space Services. Specifically, Defendant Krywe stated, in relevant part:

> The second quarter saw another strong quarter of results. **Q2 revenue increased 113% year-over-year to $19.4 million**, which topped the high end of our guidance of $19.2 million and was driven by increased adoption of our solutions by existing customers and recent new customer additions.

58.     On November 9, 2022, Spire issued a press release announcing its financial results

for the quarter ended September 30, 2022. The press release was also filed with the SEC on

November 9, 2022 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release,

the Company reported its third fiscal quarter financial highlights, stating in relevant part:

> **Third quarter 2022 revenue increased 114% year-over-year to a record $20.4 million,** achieving the high end of guidance. This was driven by new customer additions as well as increased adoption by existing customers

59.     Later on November 9, 2022, the Company held an earnings call to discuss the

Company's third quarter 2022 financial results. During the earnings call, Defendant Krywe

reiterated the Company's purportedly successful financial results. Specifically, Defendant Krywe

stated, in relevant part:

> **Q3 revenue increased 114%** year **over year to $20.4 million, hitting the top end of our guidance.** ARR at quarter end was $98.1 million, up 117% year over year.

60.     On March 8, 2023, Spire issued a press release announcing its financial results for

the quarter and fiscal year ended December 31, 2022. The press release was also filed with the

SEC on March 8, 2023 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. The press release reported the Company's financial highlights, stating in relevant part:

> **Fourth quarter 2022 revenue increased 49% year-over-year to a record $22.4 million.** This was driven by new customer additions as well as increased adoption by existing customers.

61.     Later on March 8, 2023, the Company held an earnings call to discuss the Company's fourth quarter and full year 2022 financial results. During the earnings call, Defendant Krywe reiterated the Company's purportedly successful financial results. Specifically, Defendant Krywe stated, in relevant part:

> **Q4 revenue increased 49% year-over-year to $22.4 million** once again hitting a quarterly record. For the full fiscal year, we finished at $80.3 million, a 85% year-over-year improvement and within our guidance range provided this past November.

62.     On May 10, 2023, Spire issued a press release announcing its financial results for the quarter ended March 31, 2023. The press release was also filed with the SEC on May 10, 2023 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its third fiscal quarter financial highlights, stating in relevant part:

> **First quarter 2023 revenue increased 34% year-over-year to a record $24.2 million,** which exceeded our expectations. Revenue growth was driven by new customer additions as well as increased adoption by existing customers.
>
> *        *        *
>
> First quarter GAAP gross margin increased 11 points year-over-year and 5 points quarter-over-quarter to 57%. **The gross margin improvement demonstrates our success in leveraging headcount and infrastructure costs across our 4 solutions.**

63.     Later on May 10, 2023, the Company held an earnings call to discuss the Company's first quarter 2023 finanical results. During the earnings call, Defendant Krywe reiterated the Company's purportedly successful financial results. Specifically, Defendant Krywe stated, in relevant part:

***Q1 revenue increased 34% year-over-year to $24.2 million***, once again hitting a quarterly record and exceeding the high end of our guidance. . . . Driven by exceeding our Q1 revenue expectations, our leverage business model across four solutions and high asset utilization, our Q1 operating loss came in better than guidance at $9.8 million, an improvement of $3 million year-over-year and an improvement of over $400,000 quarter-over-quarter.

*          *          *

So we have a lot more room to grow in that front, just like we've seen, right? W**e had a 10% to 11% increase year-over-year in gross margins, whether you're looking at GAAP or non-GAAP, and there was a 5% increase quarter-over-quarter.** So, seeing that there, but we're also seeing efficiencies in the operating expenses too, right?

64.     On August 9, 2023, Spire issued a news release announcing its financial results for the quarter ended June 30, 2023. The press release was also filed with the SEC on August 9, 2023 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its second fiscal quarter financial highlights, stating in relevant part:

***Second quarter 2023 revenue increased 37% year-over-year to a record $26.5 million, which exceeded the midpoint of our expectations by $2.0 million.*** Revenue growth was driven by new customer additions as well as increased adoption by existing customers.

*          *          *

***Second quarter 2023 GAAP gross margin increased 13 percentage points year-over-year and 7 percentage points quarter-over-quarter to 64%. We believe the gross margin improvement demonstrates our success in leveraging headcount and infrastructure costs across our four solutions.***

65.     Later on August 9, 2023, the Company held an earnings call to discuss the Company's second quarter 2023 fininical results. During the earnings call, Defendant Krywe reiterated the Company's purportedly successful financial results. Specifically, Defendant Krywe stated, in relevant part:

Q2 revenue increased 37% year-over-year to $26.5 million, once again hitting a quarterly record and exceeding the high end of our guidance by $1.5 million. ***Gross margins expanded to 64% on a GAAP basis and 68% on a non-GAAP basis,***

21

*representing a 13 percentage point improvement over Q2 2022 on a GAAP basis and an 11 percentage point improvement on a non-GAAP basis.*

66.     On November 8, 2023, Spire issued a press release announcing its financial results for the quarter ended September 30, 2023. The press release was also filed with the SEC on November 8, 2023 as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its third fiscal quarter financial highlights, stating in relevant part:

- *Third quarter 2023 revenue increased 34% year-over-year to a record $27.3 million,* which exceeded the top end of our expectations by $0.3 million. Revenue growth was driven by new customer additions as well as increased milestone-based projects.

- *Third quarter 2023 GAAP gross margin increased 15 percentage points year-over-year to 65%,* and non-GAAP gross margin increased 14 percentage points to 69%. We believe the gross margin improvement demonstrates our success in leveraging headcount and infrastructure costs across our solutions.

67.     Later on November 8, 2023,  the Company held an earnings call to discuss the Company's third quarter 2023 finanical results (the "3Q23 Earnings Call"). During the 3Q23 Earnings Call Defendant Basola reiterated the Company's purportedly successful financial results. Specifically, Defendant Basola stated, in relevant part:

For the third quarter in a row, we exceeded the top end of our revenue guidance with Q3 revenues of $27.3 million. This represented 34% growth year over year and was the ninth consecutive quarter of growth above 30% on a year-over-year basis."

68.     On March 6, 2024,  Spire issued a press release announcing its financial results for the quarter and fiscal year ended December 31, 2023. The press release was also filed with the SEC on March 6, 2024, as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its fourth quarter and full year financial highlights, stating in relevant part:

*Fourth quarter 2023 revenue was $27.7 million, representing the 10th consecutive quarter of record revenue.* Full year 2023 revenue was $105.7 million,

representing 32% year-over-year growth, and meeting our objective of over 30% annual revenue growth.

69. Later on March 6, 2024, the Company held an earnings call to discuss the Company's fourth quarter and full year 2024 financial results. During the earnings call, Defendant Basola reiterated the Company's purportedly successful financial results. Specifically, Defendant Basola stated, in relevant part:

> Q4 was yet another quarter of strong execution at $27.7 million of revenue. We met our expectations for the fourth quarter, an even more significant achievement considering that the launch of our North Star Constellation moved from December 2023 to January 2024 and delayed some revenue recognition. . . . For full year 2023, **_gross margins expanded to 60% on a GAAP basis and 64% on a non-GAAP basis._** This reflects a 10 percentage point improvement over 2022 on a GAAP basis, a 9 percentage point improvement on a non-GAAP basis. As we look forward to the end of 2024, we expect further improvement in our full year gross margins compared to 2023.

70. On May 15, 2024, Spire issued a press release announcing its financial results for the quarter ended March 31, 2024. The press release was also filed with the SEC on May 15, 2024, as exhibit 99.1 to Form 8-K signed by Defendant Platzer. In the press release, the Company reported its first quarter financial highlights, stating in relevant part:

> First quarter 2024 revenue was $25.7 million, representing 6% year-over-year growth.

71. The foregoing statements made in ¶¶54-70 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, as Spire later admitted, the Company's "accounting practices and procedures with respect to revenue recognition related to Space Service contracts" was incorrect because "pre-space mission activity" is not a distinct performance obligation under the contracts and the delivery of data is the only distinct performance obligation; (2) that, as a result, Spire's financial results and financial statements were not presented in accordance with GAAP; (3) that, as a result, the Company had overstated Spire's revenue; (4)

that, as a result, the Company had overstated Spire's gross margins; (5) that, as a result, Spire's financial statements could not be relied upon.

### B.      Revenue Recognition Practices

72.     On May 11, 2022, the Company submitted its quarterly report for the period ended March 31, 2022 on a Form 10-Q filed with the SEC (the "1Q22 10-Q"). The 1Q22 10-Q reported the purported manner in which the Company recognized revenue as follows, in relevant part:

*Revenue*

We derive revenue from providing data, insights and access to our cloud-based technology platform sold on a subscription basis. Some of our customer arrangements include the delivery of specific performance obligations and subsequent customer acceptance of project-based deliverables, which may impact the timing of revenue recognition. Subscription periods for our solutions generally range from one to two years and are typically non-cancelable, with customers having the right to terminate their agreements only if we materially breach our obligations under the agreement. Our subscription fees are typically billed either monthly or quarterly in advance.

73.     The above statement was substantially the same in the Form 10-Q for the period ended June 30, 2022 filed on August 10, 2022 (the "2Q22 10-Q"); the Form 10-Q for the period ended September 30, 2022  filed on November 10, 2022 (the "3Q22 10-Q"); the Form 10-K for the fiscal year ended December 31, 2022 filed on March 15, 2023 (the "FY22 10-K"); the Form 10-Q for the period ended March 31, 2023 filed on May 10, 2023 (the "1Q23 10-Q"); the Form 10-Q for the period ended June 30, 2023 filed on August 9, 2023 (the "2Q23 10-Q"); the Form 10-Q for the period ended September 30, 2023 filed on November 8, 2023 (the "3Q23 10-Q"); the Form 10-K for the fiscal year ended December 31, 2023 filed on March 6, 2024 (the "FY23 10-K"); and the Form 10-Q for the period ended March 31, 2024 filed on May 15, 2024, (the "1Q24 10-Q").

74.     The FY22 10-K further stated, in relevant part, the following concerning the Company's revenue recognition practices:

*Revenue Recognition*

24

Our contracts with customers may include promises to transfer multiple solutions and services to a customer. A performance obligation is a promise in a contract with a customer to transfer solutions or services that are capable of being distinct, whereby the customer can benefit from the solution or service either on its own or with other available resources, and are distinct in the context of the contract, whereby the transfer of the solution or service is separately identifiable from other promises in the contract. Determining whether solutions and services are distinct performance obligations that should be accounted for separately or combined as a single performance obligation involves significant judgement that requires us to assess the nature of the promise and value delivered to the customer. ***Certain of our contracts contain multiple project-based solutions and services promised to a customer over various phases (e.g., scoping, development, manufacturing, testing, launch, and/or satellite operations), which we assess at contract inception to determine which of the solutions and services promised in a contract are distinct in order to identify individual performance obligations.***

For contracts with more than one performance obligation, the transaction price is allocated among the performance obligations using the relative standalone selling price ("SSP") of each obligation. Judgment is required to determine the SSP for each distinct performance obligation. SSP is generally estimated using cost plus a reasonable margin based on value added to the customer.

For certain project-based performance obligations, we recognize a portion of our revenue over time using the output method, specifically contract milestones, which we have determined to be the most direct and reasonable measure of progress as they reflect the results achieved and value transferred to the customer.

75.     The above statement was substantially the same in the FY23 10-K filing.

76.     On March 27, 2023, the Company participated in the Canaccord Conference during which Defendant Platzer was asked questions specifically concerning the Company's Space Services revenue recognition:

Analyst: "Next one. Thanks for the details on that. I've got one more question here from the audience. It sounds like the person asking the question, they ***want to better understand how bus or satellite production for a customer*** <u>***within space services is considered a subscription recurring revenue***</u>? And they want to understand -- they understand that the rental of payload capacity on a satellite, how that could be considered subscription. But how much of that revenue is truly subscription based? And basic math says there are 99.4, if, truly subscription yields, versus 24.8% in March guidance of 21.7 to the 23.7."

Platzer: "I do admit that I'm not fully understanding that last part of the question of the numbers that you mentioned there. I'm not sure that I understood that. ***But what I can say is that what customers pay us for is the rent of a certain amount of***

***power and data generally, and access to payloads on orbit. They don't pay us for anything else.*** So their capability might be a software that sits on a piece of hardware from Spire. It could be a piece of hardware that they deliver to us, right? And then we integrate it.

But generally, ***we don't build something for a customer or give them access to everything around it.*** Literally, think of it as like Amazon AWS. They might build a data center to serve one or a number of very large customers, but the customer doesn't pay for the data center. The customer still just pays for compute power. They just pay for transportation speed. They just pay for storage.

Same thing with us. We decide to put something on a satellite with another customer, with our customers, with our payload. It depends on the software or hardware. ***So it really is a subscription to a capability on orbit that is collecting data, and that is what the customer pays us for.***"

77.     During the 3Q23 Earnings Call held on November 8, 2023, Defendant Basola

provided further purported details of the Company's accounting for Space Services, stating in

relevant part:

The second main component of CapEx is associated with our Space Services business. These cash flows are generally offset by customer payments and can vary quarter to quarter depending on the orders and the amount of build we are deploying for our customers. We may see $8 million of CapEx in one quarter, $3 million of CapEx in the next, and $11 million in another. Let me briefly explain how this works. ***In a Space Services deal, the first 12-18 months are typically what we call the pre-space portion of the deal. During pre-space, we design the integration of the payload of the customer's mission into our own bus and satellite form factor. We assemble and test those units. We achieve flight worthiness and integrate the finished product into a deployer that will be used during launch. We also coordinate the launch and place the satellites in functioning order when they get to orbit. Our subscription contracts accommodate for fees charged to our customers to fund these activities.***

***Hence, pre-space CapEx is largely funded by customer billings. Receipts and payments do not always perfectly match month to month, or even quarter to quarter. However, typically, over the pre-space portion of the deal, we are paid for what we spend.*** Since Bayer retains full ownership of the satellites, we capitalize all non-R&D expenses of pre-space as fixed assets, or PP&E. The past two quarters have had elevated pre-space CapEx, as we built a significant number of assets to be launched soon, as Peter discussed. Looking to next quarter, we expect CapEx to moderate to approximately $8 million. ***Well, after pre-space, the data provision portion of the contract starts. The assets we built allow us to secure a three to five year data subscription with billings and revenue streams from the data these assets produce. The depreciation expense from those assets match the***

*revenue that emerges from those contracts, generating a predictable and leveled gross margin performance.*

78.     On May 15, 2024, the Company held an earnings call to discuss first quarter 2024 finanical results. During the earnings call, Defendant Basola provided further purported details of the Company's accounting for Space Services, and margins, stating in relevant part:

> So when you do the math on that, yes, you should expect my gross profit to continue to improve and remain in the 65% to 70% GAAP gross profit level, which is kind of where we see our business for the long run. And again, *we do the same thing with Space Services. Space Services has a very significant data provision component after we launch. And those cash items are very significant, but also the depreciation that we will account for from those assets gets us to roughly that 70% margin for the long run also*.

79.     The foregoing statements made in ¶¶72-78 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, as Spire later admitted, the Company's "accounting practices and procedures with respect to revenue recognition related to Space Service contracts" was incorrect; (2) that Spire was not carrying out revenue recognition in the manner presented because the Company "recorded pre-space mission activity revenue" in the period before any distinct performance obligation existed in contracts where "data provision [was] the only distinct performance obligation"; (3) that, as a result, Spire had materially overstated Spire's revenue; (4) that, as a result, Spire's financial results and financial statements were not presented in accordance with GAAP.

### C.     Cost of Revenue

80.     The 1Q22 10-Q reported the Company's purported cost of revenue as follows:

*Cost of Revenue*

| (in thousands) | Three Months Ended March 31, | | 2022 to 2021 % Change |
|---|---|---|---|
| | 2022 | 2021 | |
| Total cost of revenue | $        9,846 | $        3,328 | 196% |
| Gross profit | 8,224 | 6,388 | 29% |
| Gross margin | 46% | 66% | (20)% |
| Headcount (at period end) | 38 | 20 | 90% |

27

*Cost of revenue increased $6.5 million, or 196%. $4.3 million of this growth was due to the Acquisition operating costs, retention and stock acceleration expenses.* Organic increases were primarily driven by an increase in third-party royalty costs of $0.6 million, an increase in depreciation expense of $0.5 million, an increase in computing costs of $0.5 million, $0.4 million higher personnel expenses and $0.2 million increase in Space Services hardware expenses. The increase in third-party royalty costs was driven by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions. Depreciation expense increased from the prior period driven by continued additions to our constellation and Space Services solutions. The increase in computing costs were driven by higher expenses to support customer growth and some of our weather solutions transitioning from research and development to production. The increase in personnel expenses was driven by headcount growth. The increase in Space Services third-party hardware expenses was in support of a strategic customer commitment.

81.     The 2Q22 10-Q reported the Company's purported cost of revenue as follows:

### Cost of Revenue

| (in thousands) | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | % Change | 2022 | 2021 | % Change |
| Total cost of revenue | $ 9,573 | $ 3,727 | 157% | $ 19,419 | $ 7,055 | 175% |
| Gross profit | 9,822 | 5,386 | 82% | 18,046 | 11,774 | 53% |
| Gross margin | 51% | 59% | (8)% | 48% | 63% | (14)% |
| Headcount (at period end) | 40 | 18 | 122% | 40 | 18 | 122% |

*Three Months Ended June 30, 2022 Compared to Three Months Ended June 30, 2021*

*Cost of revenue increased $5.8 million, or 157%. $4.1 million of this growth was due to the Acquisition operating costs.* Organic increases were primarily driven by an increase in computing costs of $0.6 million, an increase in personnel costs of $0.5 million, an increase in Space Services hardware expenses of $0.2 million, an increase in third-party royalty costs of $0.2 million, and an increase in depreciation expense of $0.1 million. The increase in computing costs were driven by higher expenses to support customer growth. The increase in personnel expenses was driven by headcount growth. The increase in Space Services third-party hardware expenses was in support of a strategic customer commitment. The increase in third-party royalty costs was driven by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions. Depreciation expense increased from the prior period driven by replacement of retired constellation satellites which were fully depreciated and the addition of Space Services solution satellites.

82.     The 3Q22 10-Q reported the Company's purported cost of revenue as follows:

*Cost of Revenue*

| (in thousands) | Three Months Ended September 30, | | % Change | Nine Months Ended September 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | | 2022 | 2021 | |
| Total cost of revenue | $ 10,198 | $ 5,338 | 91 % | $ 29,617 | $ 12,393 | 139 % |
| Gross profit | 10,220 | 4,223 | 142 % | 28,266 | 15,997 | 77 % |
| Gross margin | 50 % | 44 % | 6 % | 49 % | 56 % | (8) % |
| Headcount (at period end) | 44 | 22 | 100 % | 44 | 22 | 100 % |

*Three Months Ended September 30, 2022 Compared to Three Months Ended September 30, 2021*

***Cost of revenue increased $4.9 million, or 91%. $4.2 million of this growth was due to the Acquisition operating costs.*** Organic increases were primarily driven by an increase in personnel costs of $0.4 million and an increase in third-party royalty costs of $0.3 million. The increase in personnel expenses was driven by headcount growth. The increase in third-party royalty costs was driven by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions.

83.     The FY22 10-K reported the Company's purported cost of revenue as follows:

**Cost of Revenue**

| (in thousands) | Years Ended December 31, | | % Change |
|---|---|---|---|
| | 2022 | 2021 | |
| Total cost of revenue | $    40,327 | $    18,720 | 115 % |
| Gross profit | 39,941 | 24,655 | 62 % |
| Gross margin | 50 % | 57 % | (7) % |
| Headcount (at end of year) | 44 | 25 | 76 % |

***Cost of revenue increased $21.6 million, or 115%. $15.3 million of this increase was due to the Acquisition operating costs.*** Organic increases were primarily driven by an increase in computing costs of $1.6 million, an increase in personnel costs of $1.5 million, an increase in third-party royalty costs of $1.3 million, an increase in depreciation expenses of $0.8 million, an increase in Space Services third-party hardware expenses of $0.3 million, an increase in travel and entertainment expenses of $0.2 million, an increase in ground station expenses of $0.2 million, and an increase in other miscellaneous operating expenses of $0.4 million. The increase in computing costs was driven primarily by higher expenses to support customer growth and some of our weather solutions transitioning from research and development to production. The increase in personnel expenses was driven primarily by headcount growth. The increase in third-party royalty costs was driven primarily by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions. Depreciation expenses increased from the prior year driven primarily by new satellites to replace retired constellation satellites which were fully depreciated and the addition of Space Services solution satellites. The increase in Space Services third-party hardware expenses was in support of strategic customer commitments. The increase

29

in travel and entertainment expenses was driven by eased COVID-19 restrictions. The increase in ground station expenses was driven by higher operating costs on the addition of incremental capacity to improve overall data latency.

84.     The 1Q23 10-Q reported the Company's purported cost of revenue as follows:

### *Cost of Revenue*

|  | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| *(in thousands)* | 2023 | 2022 | |
| Total cost of revenue | $    10,360 | $    9,846 | 5 % |
| Gross profit | 13,808 | 8,224 | 68 % |
| Gross margin | 57 % | 46 % | 11 % |
| Headcount (at end of period) | 41 | 38 | 8 % |

*Cost of revenue increased $0.5 million, or 5%, primarily driven by an increase in personnel expenses of $0.3 million and an increase in third-party royalty costs of $0.3 million, partially offset by a decrease in other miscellaneous operating expenses of $0.1 million*. The increase in personnel expenses was driven by headcount growth. The increase in third-party royalty costs was driven by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions.

85.     The 2Q23 10-Q reported the Company's purported cost of revenue as follows:

### *Cost of Revenue*

|  | Three Months Ended June 30, | | % Change | Six Months Ended June 30, | | % Change |
|---|---|---|---|---|---|---|
| *(dollars in thousands)* | 2023 | 2022 | | 2023 | 2022 | |
| Total cost of revenue | $ 9,633 | $  9,573 | 1 % | $19,993 | $ 19,419 | 3 % |
| Gross profit | 16,860 | 9,822 | 72 % | 30,668 | 18,046 | 70 % |
| Gross margin | 64 % | 51 % | 13 % | 61 % | 48 % | 13 % |
| Headcount (at end of period) | 31 | 40 | (23 )% | 31 | 40 | (23 )% |

*Cost of revenue increased $0.1 million, or 1%, primarily driven by an increase in depreciation expense of $0.3 million, an increase in third-party royalty costs of $0.2 million, and an increase in ground station expenses of $0.1 million, partially offset by a decrease in computing costs of $0.2 million, a decrease in other miscellaneous expenses of $0.2 million and a decrease in personnel costs of $0.1 million.* Depreciation expense increased from the prior period, driven by replacement of retired constellation satellites which were fully depreciated and the addition of Space Services solution satellites. The increase in third-party royalty costs was driven by an increase in sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions. The decrease in

computing costs was driven by cloud platform efficiencies. The decrease in personnel costs was driven by overall reduction in headcount.

86.    The 3Q23 10-Q reported the Company's purported cost of revenue as follows:

*Cost of Revenue*

| (dollars in thousands) | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
|  | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| Total cost of revenue | $ 9,555 | $ 10,198 | (6)% | $ 29,548 | $ 29,617 | (0)% |
| Gross profit | 17,762 | 10,220 | 74% | 48,430 | 28,266 | 71% |
| Gross margin | 65% | 50% | 15% | 62% | 49% | 13% |
| Headcount (at end of period) | 33 | 44 | (25)% | 33 | 44 | (25)% |

*Three Months Ended September 30, 2023 Compared to Three Months Ended September 30, 2022*

**Cost of revenue decreased $0.6 million, or 6%, primarily driven by a decrease in personnel costs of $0.3 million and a decrease in computing costs of $0.3 million.** The decrease in personnel costs was driven by an overall reduction in headcount. The decrease in computing costs was driven by cloud platform efficiencies.

Gross margin for the three months ended September 30, 2023 and 2022 was 65% and 50%, respectively. The increase in the three months ended September 30, 2023 compared to the three months ended September 30, 2022 was driven primarily by leverage from higher revenue. This metric can fluctuate significantly from period to period driven primarily by the amount and timing of the revenue as well as the timing of our technology investments.

87.    The FY23 10-K reported the Company's purported cost of revenue as follows:

*Cost of Revenue*

| (dollars in thousands) | Years Ended December 31, | | % Change |
|---|---|---|---|
|  | 2023 | 2022 |  |
| Total cost of revenue | $ 42,434 | $ 40,327 | 5% |
| Gross profit | 63,269 | 39,941 | 58% |
| Gross margin | 60% | 50% | 10% |
| Headcount (at end of year) | 33 | 44 | (25)% |

**Cost of revenue increased $2.1 million, or 5%, primarily driven by an increase in depreciation expense of $3.0 million and an increase in third-party royalty costs of $1.0 million, partially offset by a decrease in personnel costs of $1.0 million and a decrease in computing costs of $0.9 million.** The increase in depreciation expense was primarily driven by a reset of the estimated useful lives of our satellites to account for the potential impact of increased solar activity related to the current solar cycle. The increase in third-party royalty costs was driven by an increase in

31

sales activity, resulting in higher payments to third-party data set providers as they augment our data solutions. The decrease in personnel costs was driven by an overall reduction in headcount. The decrease in computing costs was driven by cloud platform efficiencies.

88.    The 1Q24 10-Q reported the Company's purported cost of revenue as follows:

### Cost of Revenue

| | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| *(dollars in thousands)* | 2024 | 2023 | |
| Total cost of revenue | $    12,546 | $    10,360 | 21 % |
| Gross profit | 13,142 | 13,808 | (5)% |
| Gross margin | 51 % | 57 % | (6)% |
| Headcount (at end of period) | 36 | 41 | (12)% |

***Cost of revenue increased $2.2 million, or 21%, primarily driven by an increase in depreciation expense of $2.9 million and partially offset by a decrease in computing costs of $0.3 million, a decrease in personnel costs of $0.3 million and a decrease in other miscellaneous expenses of $0.1 million.*** The increase in depreciation expense was primarily driven by a reset of the estimated useful lives of our satellites to account for the potential impact of increased solar activity related to the current solar cycle. The decrease in computing costs was driven by cloud platform efficiencies. The decrease in personnel costs was driven by an overall reduction in headcount.

89.    The foregoing statements made in ¶¶80-88 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that, as Spire later admitted, the Company incorrectly recorded costs associated with certain contracts as "research and development" instead of "cost of revenue"; (2) that, as result, Spire had materially understated the Company's cost of revenue; (3) that, as a result, Spire had materially misstated the factors which drove the Company's cost of revenue; (4) that, Spire's financial results and financial statements were not presented in accordance with GAAP; and (5) that, as a result, Spire's financial statements could not be relied upon.

32

### D.   Costs of Research and Development

90.     The 1Q22 10-Q reported the Company's purported research and development costs as follows, in relevant part:

**Research and development**

| (in thousands) | Three Months Ended March 31, | | 2022 to 2021 % Change |
|---|---|---|---|
| | 2022 | 2021 | |
| Research and development | $   8,657 | $   6,900 | 25 % |
| Percentage of total revenue | 48 % | 71 % | |
| Headcount (at end of period) | 190 | 145 | 31 % |

***Research and development expenses increased $1.8 million, or 25%. $0.3 million of this growth was due to the Acquisition operating costs and retention expenses.*** Organic increases were primarily driven by an increase in personnel costs of $1.4 million and an increase in third-party services of $0.1 million. The increase in personnel costs was driven by growth in headcount during the period. The increase in third-party services was driven by external technical resources required to support new development processes and capabilities.

91.     The 2Q22 10-Q reported the Company's purported research and development costs as follows, in relevant part:

**Research and Development**

| (in thousands) | Three Months Ended June 30, | | % Change | Six Months Ended June 30, | | % Change |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | | 2022 | 2021 | |
| Research and development | $   8,225 | $   7,209 | 14 % | $  16,882 | $  14,109 | 20 % |
| Percentage of total revenue | 42 % | 79 % | | 45 % | 75 % | |
| Headcount (at end of period) | 187 | 155 | 21 % | 187 | 155 | 21 % |

*Three Months Ended June 30, 2022 Compared to Three Months Ended June 30, 2021*

***Research and development expenses increased $1.0 million, or 14%. $0.3 million of this growth was due to the Acquisition operating costs and retention expenses.*** Organic increases were primarily driven by an increase in personnel costs of $0.5 million and an increase in software expenses of $0.3 million. The increase in personnel costs was driven by growth in headcount during the period. The increase in software expenses was driven by headcount growth and resources required to support new development processes and capabilities.

33

92.     The 3Q22 10-Q reported the Company's purported research and development costs as follows, in relevant part:

### *Research and Development*

| (in thousands) | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2022 | 2021 | % Change | 2022 | 2021 | % Change |
| Research and development | $ 8,879 | $ 7,804 | 14 % | $ 25,761 | $ 21,913 | 18 % |
| Percentage of total revenue | | 43 % | 82 % | | 45 % | 77 % |
| Headcount (at end of period) | | 200 | 172 | 16 % | 200 | 172 | 16 % |

***Research and development expenses increased $1.1 million, or 14%. $0.4 million of this growth was due to the Acquisition operating costs***. Organic increases were primarily driven by an increase in personnel costs of $0.9 million, an increase in software expenses of $0.1 million, and an increase in other miscellaneous operating expenses of $0.1 million, partially offset by a decrease in consulting expenses of $0.4 million. The increase in personnel costs was driven by growth in headcount during the period. The increase in software expenses was driven by headcount growth and resources required to support new development processes and capabilities. The decrease in consulting expenses was driven by a reduction of external technical resources, and a shift to internal resources, to support new development processes and capabilities.

93.     The FY22 10-K reported the Company's purported research and development costs as follows, in relevant part:

### *Research and Development*

| (in thousands) | Years Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | % Change |
| Research and development | $ 35,153 | $ 31,615 | 11 % |
| Percentage of total revenue | 44 % | 73 % | |
| Headcount (at end of year) | 206 | 181 | 14 % |

***Research and development expenses increased $3.5 million, or 11%. $0.9 million of this growth was due to the Acquisition operating costs.*** Organic increases were primarily driven by an increase in personnel costs of $3.1 million, and an increase in travel and entertainment expenses of $0.3 million, partially ***offset by a decrease in consulting expenses of $0.7 million and a decrease in other miscellaneous operating expenses of $0.1 million.*** The increase in personnel costs was driven by growth in headcount and salary adjustments during the year. The increase in travel and entertainment expenses was driven by eased COVID-19 restrictions. The decrease in consulting expenses was driven by a reduction of external technical resources, and a shift to internal resources, to support new development processes and capabilities.

34

*While we expect research and development expenses to increase in absolute dollars in future periods primarily due to higher headcount* as we continue to invest in the development of our solutions offerings and new technologies, we expect research and development expenses to decrease as a percentage of revenue in future periods as our revenue growth exceeds our growth in research and development spend.

94.     The 1Q23 10-Q reported the Company's purported research and development costs

as follows, in relevant part:

### Research and Development

| (in thousands) | | Three Months Ended March 31, | | |
|---|---|---|---|---|
| | | 2023 | 2022 | % Change |
| Research and development | $ | 9,663 | $ 8,657 | 12% |
| Percentage of total revenue | | 40% | 48% | |
| Headcount (at end of period) | | 211 | 190 | 11% |

*Research and development expenses increased $1.0 million, or 12%, primarily driven by an increase in personnel costs of $1.1 million, and an increase in travel and entertainment expenses of $0.2 million, partially offset by a decrease in consulting expenses of $0.2 million and a decrease in other miscellaneous operating expenses of $0.1 million.* The increase in personnel costs was driven by overall growth in headcount. The increase in travel and entertainment expenses was driven by eased COVID-19 restrictions. The decrease in consulting expenses was driven by a reduction of external technical resources, and a shift to internal resources, to support new development processes and capabilities.

95.     The 2Q23 10-Q reported the Company's purported research and development costs

as follows, in relevant part:

### Research and Development

| (dollars in thousands) | | Three Months Ended June 30, | | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | | 2023 | 2022 | % Change | | 2023 | 2022 | % Change |
| Research and development | $ | 9,752 | $ 8,225 | 19% | $ | 19,415 | $ 16,882 | 15% |
| Percentage of total revenue | | 37% | 42% | | | 38% | 45% | |
| Headcount (at end of period) | | 210 | 187 | 12% | | 210 | 187 | 12% |

*Three Months Ended June 30, 2023 Compared to Three Months Ended June 30, 2022*

*Research and development expenses increased $1.5 million, or 19%, primarily driven by an increase in personnel costs of $1.2 million, an increase in other miscellaneous operating expenses of $0.2 million, and an increase in travel and*

35

*entertainment expenses of $0.1 million.* The increase in personnel costs was driven by overall growth in headcount. The increase in travel and entertainment expenses was driven by eased COVID-19 restrictions.

96.    The 3Q23 10-Q reported the Company's purported research and development costs as follows, in relevant part:

### *Research and Development*

| (dollars in thousands) | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | % Change | 2023 | 2022 | % Change |
| Research and development | $ 10,538 | $ 8,879 | 19 % | $ 29,953 | $ 25,761 | 16 % |
| Percentage of total revenue | 39 % | 43 % | | 38 % | 45 % | |
| Headcount (at end of period) | 221 | 200 | 11 % | 221 | 200 | 11 % |

*Three Months Ended September 30, 2023 Compared to Three Months Ended September 30, 2022*

*Research and development expenses increased $1.7 million, or 19%, primarily driven by an increase in personnel costs of $1.3 million, an increase in other miscellaneous operating expenses of $0.2 million, an increase in equipment expenses of $0.1 million, and an increase in travel and entertainment expenses of $0.1 million*. The increase in personnel costs was driven by overall growth in headcount. The increase in equipment expenses was driven by resources to support new development processes and capabilities. The increase in travel and entertainment expenses was driven by eased COVID-19 restrictions.

97.    The FY23 10-K reported the Company's purported research and development costs as follows, in relevant part:

### *Research and Development*

| (dollars in thousands) | Years Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | % Change |
| Research and development | $ 38,923 | $ 35,153 | 11 % |
| Percentage of total revenue | 37 % | 44 % | |
| Headcount (at end of year) | 221 | 206 | 7 % |

*Research and development expenses increased $3.8 million, or 11%, primarily driven by an increase in personnel costs of $3.6 million and an increase in computing costs of $0.2 million to support customer growth.* The increase in personnel costs was driven by overall growth in headcount, which was partially offset by lower bonus payouts to management.

98.     The 1Q24 10-Q reported the Company's purported research and development costs as follows, in relevant part:

### *Research and Development*

| (dollars in thousands) | Three Months Ended March 31, | | % Change |
| | 2024 | 2023 | |
|---|---|---|---|
| Research and development | $   9,909 | $   9,663 | 3 % |
| Percentage of total revenue | 39 % | 40 % | |
| Headcount (at end of period) | 232 | 211 | 10 % |

***Research and development expenses increased $0.2 million, or 3%, primarily driven by an increase in professional services fees of $0.2 million, an increase in software expenses of $0.2 million and an increase in personnel costs of $0.1 million, partially offset by a decrease in bonus expenses of $0.3 million.*** The increase in professional services fees and software expenses was driven by additional technical resources required to support new development processes and capabilities. The increase in personnel costs was driven by overall growth in headcount.

99.     The foregoing statements made in ¶¶90-98 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1)  that, as Spire later admitted, the Company incorrectly recorded costs associated with certain contracts as "research and development" instead of "cost of revenue"; (2) that, as result, Spire had materially overstated the Company's costs of research and development; (3) that, as a result, Spire had materially misstated the factors which drove the Company's cost of research and development; (4) that Spire's financial results and financial statements were not presented in accordance with GAAP; and (5) that, as a result, Spire's financial statements could not be relied upon.

### E.     Gross Margins

100.     The 1Q22 10-Q reported the Company's purported gross margins as follows, in relevant part:

***Gross margin for the three months ended March 31, 2022 and 2021 was 46% and 66%, respectively.*** The decrease in the three months ended March 31, 2022

compared to the three months ended March 31, 2021 was driven primarily by higher royalties, depreciation, computing expenses, personnel expenses, and strategic customer expenses as described above. This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue. The Acquisition negatively impacted gross margin by approximately 13%. Of this reduction, approximately half was driven by purchase accounting adjustments including reduction to exactEarth deferred revenue and amortization of purchased intangibles.

101.     The 2Q22 10-Q reported the Company's purported gross margins as follows, in relevant part:

**Gross margin for the three months ended June 30, 2022 and 2021 was 51% and 59%, respectively.** The decrease in the three months ended June 30, 2022 compared to the three months ended June 30, 2021 was driven primarily by the computing expenses, personnel expenses, higher royalties, strategic customer expenses and depreciation as described above. This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue. The Acquisition negatively impacted gross margin by approximately 13%. Of this reduction, approximately half was driven by purchase accounting adjustments including a reduction to exactEarth deferred revenue and an increase in amortization of purchased intangibles.

102.     The 3Q22 10-Q reported the Company's purported gross margins as follows, in relevant part:

G*ross margin for the three months ended September 30, 2022 and 2021 was 50% and 44%, respectively. The increase in the three months ended September 30, 2022 compared to the three months ended September 30, 2021 was driven primarily by higher revenue and the relatively higher impact of strategic customer expenses in the third quarter of 2021.* This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue. The Acquisition negatively impacted gross margin by approximately 12%. Of this reduction, approximately two-thirds was driven by purchase accounting adjustments including a reduction to exactEarth deferred revenue and an increase in amortization of purchased intangibles.

103.     The FY22 10-K reported the Company's purported gross margins as follows, in relevant part:

***Gross margin for fiscal year 2022 and fiscal year 2021 was 50% and 57%, respectively.*** The Acquisition negatively impacted gross margin for fiscal year 2022 by approximately 12% and fiscal year 2021 by approximately 2%. Of these Acquisition-related gross margin reductions, approximately half was driven by purchase accounting adjustments to reduce the value of deferred revenue and to amortize purchased intangible assets. This metric can fluctuate significantly from period to period driven by the timing of the revenue as well as the timing of our technology investments to support future revenue.

104.    The 1Q23 10-Q reported the Company's purported gross margins as follows, in

relevant part:

***Gross margin for the three months ended March 31, 2023 and 2022 was 57% and 46%, respectively. The increase in the three months ended March 31, 2023 compared to the three months ended March 31, 2022 was driven primarily by higher revenue.*** This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue.

105.    The 2Q23 10-Q reported the Company's purported gross margins as follows, in

relevant part:

***Gross margin for the three months ended June 30, 2023 and 2022 was 64% and 51%, respectively. The increase in the three months ended June 30, 2023 compared to the three months ended June 30, 2022 was driven primarily by higher revenue***. This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue.

106.    The 3Q23 10-Q reported the Company's purported gross margins as follows, in

relevant part:

***Gross margin for the three months ended September 30, 2023 and 2022 was 65% and 50%, respectively. The increase in the three months ended September 30, 2023 compared to the three months ended September 30, 2022 was driven primarily by leverage from higher revenue.*** This metric can fluctuate significantly from period to period driven primarily by the amount and timing of the revenue as well as the timing of our technology investments.

107.    The FY23 10-K reported the Company's purported gross margins as follows, in

relevant part:

> *Gross margin for fiscal years 2023 and 2022 was 60% and 50%, respectively. The increase in fiscal year 2023 compared to fiscal year 2022 was driven primarily by leverage from higher revenue*. This metric can fluctuate significantly from period to period driven primarily by the amount and timing of the revenue as well as the timing of our technology investments.

108.   The 1Q24 10-Q reported the Company's purported gross margins as follows, in relevant part:

> *Gross margin for the three months ended March 31, 2024 and 2023 was 51% and 57%, respectively. The decrease was driven primarily by higher depreciation expense as described above.* This metric can fluctuate significantly from period to period driven primarily by the timing of the revenue as well as the timing of our technology investments to support future revenue.
>
> We expect cost of revenue, including depreciation and amortization expenses, third-party operating costs and royalties, and high-powered computing costs, to decrease in absolute dollars during the remainder of the year as accelerated depreciation declines to reflect our constellation replenishment efforts. *We anticipate gross margins to increase closer to the 65-70% level as a consequence of our sales increases and reductions in cost of revenue.*

109.   The foregoing statements made in ¶¶100-108 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that, as Spire later admitted, the Company had incorrectly recorded revenue because pre-space mission activity is not a distinct performance obligation of Space Services contracts; (2) that, as Spire later admitted, the Company incorrectly recorded costs associated with certain contracts as "research and development"; (3) that, as a result, Spire had overstated revenue and understated costs of revenue; (4) that, as a result, Spire materially overstated the Company's gross margins; (5) that, as a result, Spire had materially misstated the factors which drove the Company's gross margins; and (6) that, as a result, Spire's financial statements could not be relied upon.

### F.      The Company's Internal Controls Over Financial Reporting

110.     The 1Q22 10-Q reported the Company's purported internal controls and procedures as follows, in relevant part:

**Item 4. Controls and Procedures**

***Evaluation of Disclosure Controls and Procedure*s**

\*              \*              \*

Our principal executive officer and principal financial officer carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as such term is defined in Rule(s) 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2022. ***Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of March 31, 2022 because of the material weaknesses in internal control over financial reporting described below.***

**Material Weaknesses in Internal Control over Financial Reporting**

***We have identified material weaknesses in our internal control over financial reporting.*** A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses are as follows:

***We did not design and maintain an effective control environment commensurate with the financial reporting requirements of a public company.*** Specifically, we lacked a sufficient number of professionals with an appropriate level of internal controls and accounting knowledge, training, and experience to appropriately analyze, record and disclose accounting matters timely and accurately. Additionally, the lack of a sufficient number of professionals resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of our financial reporting objectives, as demonstrated by, amongst other things, insufficient segregation of duties in our finance and accounting functions. This material weakness contributed to the following additional material weaknesses.

(i) We did not design and maintain an effective risk assessment process at a precise enough level to identify new and evolving risks of material misstatement in our financial statements. Specifically, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement in the financial statements.

41

(ii) We did not design and maintain effective controls over the segregation of duties related to journal entries and account reconciliations. Specifically, certain personnel have the ability to both (a) create and post journal entries within our general ledger system, and (b) prepare and review account reconciliations;

***The material weaknesses above resulted in certain immaterial audit adjustments, which were recorded prior to the issuance of the Consolidated Financial Statements as of and for the year ended December 31, 2020.*** Additionally, these material weaknesses could result in a misstatement of substantially all of our accounts or disclosures that would result in a material misstatement to the annual or interim Consolidated Financial Statements that would not be prevented or detected.

 (iii) We did not design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of GAAP of such transactions. Specifically, we did not design and maintain controls to timely identify and account for warrant instruments, and to account for business combinations, including the associated valuation estimates and the completeness and accuracy of the opening balance sheet. The material weakness related to warrant instruments resulted in the restatement of the previously issued financial statements of NavSight related to adjustments to warrant liabilities and equity. The material weakness related to business combinations did not result in a misstatement to our Consolidated Financial Statements. Additionally, these material weaknesses could result in a misstatement of substantially all of our accounts or disclosures that would result in a material misstatement to the annual or interim Consolidated Financial Statements that would not be prevented or detected.

(iv) We did not design and maintain effective controls over certain information technology ("IT") general controls for information systems that are relevant to the preparation of our financial statements.

111.     The above statement was substantially the same in the 2Q22 10-Q filing.

112.     The above statement was substantially the same in the 3Q22 10-Q, filing except as to the portion concerning the Company's failure to design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, which stated, in relevant part:

(iii) We did not design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of GAAP to such transactions. Specifically, we did not design and maintain:

(a) controls to timely identify and account for warrant instruments, which resulted in the restatement of the previously issued financial statements of NavSight related to adjustments to warrant liabilities and equity;

(b) controls to account for business combinations, including the associated valuation estimates and the completeness and accuracy of the opening balance sheet, which did not result in a misstatement to our consolidated financial statements;

(c) *controls to timely identify and account for the fair value of the contingent earnout liability, which resulted in an error in the fair value of the contingent earnout liability in, and the restatement of, our previously issued unaudited condensed consolidated financial statements as of and for each of the interim periods ended September 30, 2021, March 31, 2022 and June 30, 2022 and our consolidated financial statements as of and for the year ended December 31, 2021*.

Additionally, these material weaknesses could result in a misstatement of substantially all of our accounts or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

113.    The FY22 10-K reported the Company's purported internal controls and procedures as follows, in relevant part:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

*            *            *

We performed an evaluation under the supervision and with the participation of management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as such term is defined in Rule(s) 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2022. *Based upon that evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2022 because of the material weaknesses in internal control over financial reporting described below.*

*Notwithstanding the material weaknesses described in Management's Report on Internal Control over Financial Reporting, our management has concluded that our consolidated financial statements for the periods covered by and included in this Annual Report are prepared in accordance with accounting principles generally accepted in the United States ("GAAP") and fairly present, in all*

*material respects, our financial position, results of operations and cash flows for each of the periods presented herein.*

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.

*          *          *

We did not design and maintain an effective control environment commensurate with the financial reporting requirements of a public company. Specifically, we lacked a sufficient number of professionals with an appropriate level of internal controls and accounting knowledge, training, and experience to appropriately analyze, record and disclose accounting matters timely and accurately. Additionally, the lack of a sufficient number of professionals resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of our financial reporting objectives, as demonstrated by, amongst other things, insufficient segregation of duties in our finance and accounting functions.

114.    The above statement was substantially the same in the 1Q23 10-Q, 2Q23 10-Q, 3Q23 10-Q, FY23 10-K, and 1Q24 10-Q.

115.    The foregoing statements made in ¶¶110-114 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Spire's financial results and financial statements were not presented in accordance with GAAP; (2) that the Company had material weaknesses in internal control over financial reporting related to its revenue recognition practices.

## VI.    LOSS CAUSATION

116.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Spire's stock price throughout the Class

Period until Defendants began to disclose the truth regarding the Company's financial results to the market.  The truth regarding the Company's financial results was partially revealed, and/or the concealed risks materialized, on or about August 14, 2024.

117.    On August 14, 2024, after the market closed, the Company disclosed it was "reviewing its accounting practices and procedures with respect to revenue recognition" regarding certain Space Services contracts and "related internal control matters." The Company further disclosed the "type of Contracts that the Company has identified for re-evaluation resulted in recognized revenue of $10 to $15 million on an annual basis" and "additional financial measures such as gross profit could also be impacted."   On this news, the Company's share price fell $3.41 or 33.56%, to close at $6.75 per share on August 15, 2024, on unusually heavy trading volume.

118.    During the Class Period, Plaintiffs and the Class purchased Spire's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

119.    As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of Spire were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

120.    As alleged herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Spire, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their

associations with Spire which made them privy to confidential proprietary information concerning Spire, participated in the fraudulent scheme alleged herein.

> **A.      That The Revenue At Issue Involved The Company's Core Business Supports A Finding Of Scienter**

121.     Though the Company does not break out its revenue by segment or business, analysts estimated that Space Services accounted for as much as 25% of Spire's revenue. On September 27, 2022, Canaccord Genuity published analyst report stating that "***Space Services segment (~25% of revenues)***" provided "significant optionality." By June 5, 2024, Craig-Hallum estimated that Space Services accounted "~29% of revenue."

122.     The Individual Defendants also admitted that Spire's Space Services contracts were subscription-based revenue because customers only pay for "power and data." On March 27, 2023, at the Canaccord Genuity New Space Investor Summit, Defendant Platzer was  asked by an analyst "how . . . satellite production for a customer within space services is considered a subscription recurring revenue?" Defendant Platzer responded that "***what customers pay us for is the rent of a certain amount of power and data generally, and access to payloads on orbit. They don't pay us for anything else.***" Similarly, at the Emerging Growth Virtual Conference on May 31, 2023, Defendant Platzer stated that "Virtually all of our products are recurring subscription businesses where you subscribe for an annual service that is paid generally quarterly in advance." Defendant Platzer claimed that Spire was fundamentally a "data company" or a "classic SaaS" (i.e., software-as-a-service). That the Individual Defendants characterized Spire as a "data" company underscores that they knew or should have known that the Company could not recognize revenue from pre-space mission activities (which did not itself provide data to customers) in Space Services contracts, especially because they admitted that customers only pay for "data."

123.    Due to the revenues derived from Space Services being such a material amount of the Company's revenues and Platzer's characterization that customers only pay for "power and data," the Individual Defendants were aware that Spire improperly recognized revenue for pre-space activities; or, if the CEO and CFOs were unaware, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members. However, the most reasonable inference is that the Individual Defendants were aware of these facts.

**B.      The Removal Of The Company's Executive Amid The Revenue Re-Evaluation And Announcement That The Financial Results Could No Longer Be Relied On Supports Scienter**

124.    Spire announced the "removal" of Defendant Platzer as CEO on December 3, 2024. Platzer had been at the Company since before it became a public entity in 2021.  Platzer co-founded Legacy Spire in 2012 and served as its CEO until it merged with NavSight Holdings Inc. in August 2021. The announcement of Platzer's removal followed several disclosures that Spire had overstated its revenue for the Space Services segment, understated its costs of revenues, and thereby overstated gross profit.

125.    The most logical inference from the timing of Platzer's removal is that he had knowledge of the conduct alleged herein or acted recklessly in not knowing.

**C.      The Company's Admission That It Completely Lacked  Internal Controls Throughout The Class Period Supports A Finding Of Scienter**

126.    Spire's management is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations

of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").

127.    By Spire's own admission, there are material weaknesses in its internal control over financial reporting. On November 4, 2024, the Company stated that it expects to report "one or more material weaknesses." This revelation came amid several disclosures that the Company was reevaluating its financial results for a 2-year period for revenue, costs of revenue, and gross profit.

128.    The inference that the Company's executives were aware of this improper conduct is further supported by the fact that, throughout the Class Period, Spire had a myriad of internal control deficiencies. *See* Sec. V.F. The Individual Defendants claimed to be remediating them, which means that they closely evaluated the existing controls and processes for procedures as fundamental to Spire as revenue recognition. The fact that they did not uncover the incorrect revenue recognition supports an inference that the Individual Defendants already knew about it or, at a minimum, were reckless in not knowing about it.

129.    Indeed, analysts suspected that Defendants knew of the impending restatement well before they disclosed it to investors. For example, on August 15, 2024, Craig-Hallum Capital Group LLC published an analyst report observing that the "[C]ompany scheduled their earnings date on the very last date that 10-Qs are due," which was not normally the Company's habit, and "***[t]his would seem to imply that the company knew they were going to need as much time as they could get, as early as 7.24.24 when they scheduled the Q2 call***."

### D.    Corporate Scienter

130.    Each of the Individual Defendants was a high-ranking management-level employee that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in his/her role as an executive

employee and representative of Spire. The scienter of each of these individuals and all other management-level employees of Spire, is therefore imputed to Defendant Spire.

## VIII.   CLASS ACTION ALLEGATIONS

131.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Spire securities between May 11, 2022 and August 14, 2024, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

132.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Spire's shares actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Spire shares were traded publicly during the Class Period on the New York Stock Exchange.

133.   Record owners and other members of the Class may be identified from records maintained by Spire or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

134.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

135.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

136.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Spire; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

137.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET DOCTRINE)

138.    The market for Spire's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Spire's securities traded at artificially inflated prices during the Class Period.  On March 20, 2024, the Company's share price closed at a Class Period high of $17.47 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Spire's securities and market information relating to Spire, and have been damaged thereby.

139.     During the Class Period, the artificial inflation of Spire's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spire's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Spire and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

140.     At all relevant times, the market for Spire's securities was an efficient market for the following reasons, among others:

(a)     Spire shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Spire filed periodic public reports with the SEC and/or the NYSE;

(c)     Spire regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and by directly emailing its financials to investors who requested such alerts on Spire's website and/or

(d)     Spire was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

141.    As a result of the foregoing, the market for Spire's securities promptly digested current information regarding Spire from all publicly available sources and reflected such information in Spire's share price. Under these circumstances, all purchasers of Spire's securities during the Class Period suffered similar injury through their purchase of Spire's securities at artificially inflated prices and a presumption of reliance applies.

142.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    UNDISCLOSED ADVERSE FACTS

143.    The market for Spire's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Spire's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Spire's securities relying upon

the integrity of the market price of the Company's securities and market information relating to Spire, and have been damaged thereby.

144.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Spire's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. These statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Spire's business, operations, and prospects as alleged herein.

145.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spire's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI.    NO SAFE HARBOR

146.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

147.    The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be

false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

148.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Spire who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

## XII.    CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

149.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

150.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Spire's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

151.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spire's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

152.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Spire's financial well-being and prospects, as specified herein.

153.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spire's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Spire and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

154.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

55

team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

155.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spire's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

156.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Spire's securities was artificially inflated during the Class Period.  In ignorance of the fact that market

prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spire's securities during the Class Period at artificially high prices and were damaged thereby.

157.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Spire was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Spire securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

158.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

160.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

161.   Individual Defendants acted as controlling persons of Spire within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

162.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

163.   As set forth above, Spire and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMANDED

164.    Plaintiff hereby demands a trial by jury.

Dated: December 23, 2024

*/s/ Paul M. Falabella*
BUTLER CURWOOD PLC
Paul M. Falabella (VSB No. 81199)
Craig J. Curwood (VSB No. 43975)
140 Virginia Street, Suite 302
Richmond, VA 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
paul@butlercurwood.com
craig@butlercurwood.com

*Local Counsel for Lead Plaintiff Michal Bousso*

GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
csadler@glancylaw.com

Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007

Facsimile: (212) 884-0988
rdawson@glancylaw.com

*Counsel for Lead Plaintiff Michal Bousso*

THE LAW OFFICES OF FRANK R. CRUZ
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel*