**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| IN RE SPIRE GLOBAL, INC. SECURITIES LITIGATION | Master File No. 1:24-cv-1458-MSN-WEF |

<u>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

I.      Spire Offers a Range of Satellite-Based Data Services, Including a Subscription-Based "Space Services" Platform. ......................................................................... 3

II.     During the Class Period, Spire Reports Its Financial Results and Defendants Periodically Discuss with Investors Revenue Earned from Space Services. ..................... 5

III.    During the Class Period, Spire Informs Investors That Deficiencies May Require It to Restate Its Financial Results. ......................................................................... 8

IV.     On the Last Day of the Class Period, August 14, 2024, Spire Discloses That It Would Be Delaying Filing Its Quarterly Results Because of Accounting Deficiencies with How It Recognizes Space Services Revenue, and Its Stock Price Falls. ........................................................................................................ 9

V.      Spire Continues to Update Investors About the Accounting Issues and Its Stock Price Quickly Recovers. ................................................................................... 10

        A.      On August 27, 2024, Spire Announces That It Will Restate Its Financials to Correct Any Technical Misstatements of Space Services Revenue. ............... 10

        B.      Spire's Stock Recovers to its August 14, 2024 Level Within Weeks. ................. 10

        C.      On November 4, 2024, Spire Further Updates Investors About the Space Services Accounting Review and Also Notes that It Is Reviewing How It Treats R&D Expenses Related to Government Contracts. ................................. 11

VI.     Before Spire Issues Any Restatements, Plaintiff Files Her Complaint. .......................... 11

ARGUMENT ...................................................................................................................... 12

I.      Plaintiff Fails To Plead Specific Facts Giving Rise To A Strong Inference Of Scienter. ...................................................................................................... 13

        A.      To Start, Because Plaintiff Does Not Allege Any Plausible Motive for Defendants to Commit Fraud, Its Other Scienter Allegations Must Be "Correspondingly Greater." .................................................................... 14

                1.      Complaints lacking motive allegations face a high bar. ........................ 14

                2.      The Complaint falls far short of alleging any fraudulent motive............. 15

        B.      Plaintiff's Scant Scienter Allegations Do Not "Strongly" Suggest that Defendants Acted With Scienter. .............................................................. 18

                1.      Plaintiff's "core operations" allegations do not give rise to any inference of scienter. .............................................................. 18

2.      Platzer's statements to investors about Space Services revenue do not give rise to any inference of scienter. ................................................ 21

3.      Platzer's "planned transition" from CEO to Executive Chairman does not give rise to any inference of scienter. ....................................... 22

4.      Spire's candid disclosures of material weaknesses in accounting help Defendants, not Plaintiff. .................................................................. 24

5.      Plaintiff's "corporate scienter" allegations fail. ...................................... 26

C.      The More Cogent and Compelling Inference Is That Defendants Disclosed Accounting Problems Once They Became Known And Promptly Endeavored To Correct Them In Good Faith. ...................................................... 26

1.      Plaintiff's failure to allege net sales of Spire stock by the Individual Defendants negates an inference of scienter. ......................... 27

2.      Approval of Spire's financial statements by Spire's auditor undermines any inference of scienter. .................................................... 28

3.      The complexity of the accounting issues further undermines any inference of scienter. ................................................................................ 29

4.      The more compelling inference is that Spire made innocent mistakes, and promptly corrected them when they came to light. ........... 30

II.      Plaintiff Fails to Plausibly Allege Loss Causation with Respect to Statements Related to Research and Development Expenses. ........................................... 33

III.      Plaintiff Fails to Plead Control Person Claims. ................................................ 35

CONCLUSION ........................................................................................................... 35

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                          **Page(s)**

*Bajjuri v. Raytheon Tech. Corp.*,
    2023 WL 3650554 (D. Ariz. May 25, 2023) ...........................................................................35

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
    547 F. Supp. 3d 439 (S.D.N.Y. 2021) .....................................................................................35

*Boykin v. K12, Inc.*,
    54 F.4th 175 (4th Cir. 2022) .........................................................................................12, 13, 15

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .............................................................................34

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ...............................................................................28

*Cozzarelli v. Inspire Pharm., Inc.*,
    549 F.3d 618 (4th Cir. 2008) .....................................................................................................3

*Employ. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v.*
    *MacroGenics, Inc.*, 61 F.4th 369 (4th Cir. 2023) .....................................................................2

*Firemen's Ret. Sys. of St. Louis v. Telos Corp.*,
    2023 WL 1512207 (E.D. Va. Feb. 1, 2023) ...................................................................... *passim*

*Gonzalez v. Cano Health, Inc.*,
    2024 WL 4415216 (S.D. Fla. Oct. 4, 2024) ............................................................................30

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) .....................................................................................................3

*Hoang v. ContextLogic, Inc.*,
    2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ...................................................................34, 35

*I.B.E.W. v. Ltd. Brands, Inc.*,
    788 F. Supp. 2d 609 (S.D. Ohio 2011) ....................................................................................27

*In re Baxter Int'l Inc. Sec. Litig.*,
    2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ......................................................20, 22, 26, 29

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) .....................................................................................28

*In re China Organic Sec. Litig.*,
    2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) ........................................................................34

*In re Gold Resources Corp. Sec. Litig.*,
  776 F.3d 1103 (10th Cir. 2015) ........................................................................32

*In re Hertz Global Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018)..................................................................20, 24, 32

*In re KLX, Inc. Sec. Litig.*,
  232 F. Supp. 3d 1269 (S.D. Fla. 2017) ...........................................................26

*In re Medicis Pharm. Corp. Sec. Litig.*,
  689 F. Supp. 2d 1192 (D. Ariz. 2009) .........................................................17, 29, 30

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  629 F. Supp. 2d 1207 (W.D. Wash. 2009)............................................................17

*In re Neustar Sec.*,
  83 F. Supp. 3d 671 (E.D. Va. 2015) ...............................................................21, 23

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ........................................................................24

*In re PEC Sols., Inc. Sec. Litig.*,
  418 F.3d 379 (4th Cir. 2005) .........................................................................28

*In re SCB Computer Tech., Inc. Sec. Litig.*,
  149 F. Supp. 2d 334 (W.D. Tenn. 2001)...............................................................17

*In re Triangle Capital Corp. Sec. Litig.*,
  988 F.3d 743 (4th Cir. 2021) ................................................................. *passim*

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ...............................................................21, 27

*Jackson Inv. Grp., LLC v. Thomas*,
  325 F. Supp. 3d 1334 (N.D. Ga. 2017)...............................................................16, 27, 29

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)............................................................................26

*Katyle v. Penn Nat. Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ........................................................................33, 34, 35

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ................................................................. *passim*

*Knurr v. Orbital ATK, Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) ...............................................................13, 15, 20, 32

*Knurr v. Orbital ATK, Inc.*,
  294 F. Supp. 3d 498 (E.D. Va. 2018) ................................................................................29

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ...............................................................................3, 12, 13

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) .........................................................................................33

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
  2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ......................................................19, 20, 29, 32

*Ottman v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ............................................................................................13

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  266 F. Supp. 3d 1154 (E.D. Wis. 2017)....................................................................22, 29, 32

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.*
  *Holdings, Ltd.*,
  886 F. Supp. 2d 328 (S.D.N.Y. 2012).................................................................................35

*Proter v. Medifast, Inc.*,
  2013 WL 1316034 (D. Md. Mar. 28, 2013)..................................................................... *passim*

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
  75 F.4th 232 (4th Cir. 2023) ..................................................................................... *passim*

*Stein v. Bridgepoint Edu., Inc.*,
  2020 WL 3250596 (S.D. Cal. June 15, 2020).....................................................................30

*Steinberg v. Schmitt Indus., Inc.*,
  2024 WL 1007879 (D. Ore. Feb. 2, 2024)...............................................................17, 24, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................................1, 12, 13, 14

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018) .........................................................................24, 25

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .....................................................................................20, 29, 32

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) ...................................................................................... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................................32

**Federal Statutes**

15 U.S.C. § 78j-1(b)......................................................................................................................29

15 U.S.C. § 78j(b) ...................................................................................................................12, 35

15 U.S.C. § 78t(a) ..........................................................................................................................35

15 U.S.C. § 78u-4(b)...........................................................................................................1, 12, 33

**Regulations**

17 C.F.R. § 240.10b-5....................................................................................................................12

**INTRODUCTION**

This putative securities fraud class action arises out of a (not yet issued) accounting restatement set to be made by Defendant Spire Global, Inc. ("Spire"). Spire is a space-to-cloud data and analytics company based in Vienna, Virginia that specializes in the tracking of global data through its constellation of nanosatellites. In August 2024, Spire announced that it would be restating certain of its financial statements because it had discovered an error as to how Spire recognized revenue for certain of its space services contracts. When the error was discovered, Spire candidly told investors that it was reviewing its accounting procedures on revenue recognition and that it may have to revise its financial statements to reflect new accounting treatment for those contracts, among other issues. Spire's stock dropped after the announcement.

Plaintiff Michal Bousso, a Spire shareholder, immediately filed suit, claiming that the stock drop stemmed from intentional securities fraud. She alleges that Spire and some of its current and former executives (the "Individual Defendants" and, with Spire, "Defendants") may have known about the accounting issues before the need for a restatement was announced. Thus, Plaintiff claims, all of Spire's financials for the two years preceding August 14, 2024, were "materially misleading" and Defendants defrauded investors when issuing them.

There are multiple problems with Plaintiff's lawsuit, including a threshold, fatal defect: securities fraud suits are subject to rigorous pleading standards under the Private Securities Litigation Reform Act (PSLRA), and Plaintiff's Complaint comes nowhere close to satisfying the PSLRA's heightened pleading standard for scienter. To survive dismissal, the Complaint must plead specific facts "strong[ly]" suggesting that Defendants acted with a contemporaneous fraudulent intent, *i.e.*, "scienter." 15 U.S.C. § 78u-4(b)(2)(A). This is among the highest pleading standards in all of American civil law, and was specifically passed to curb meritless lawsuits. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-21 (2007).

1

The Complaint falls far short of the standard for pleading scienter under the PSLRA. All it alleges is that technical accounting mistakes occurred, and that Spire must now restate some of its financials as a result. Plaintiff fails to allege any *facts* suggesting that Defendants *knew* about the mistakes before August 14, that Defendants *hid* the mistakes from investors, or even that Defendants had a *motive* to defraud investors. Indeed, as shown below, the facts squarely *undercut* any inference that the Defendants made intentionally false statements. Under Fourth Circuit precedent, such minimal allegations fail to show scienter as a matter of law. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) (affirming dismissal of securities fraud complaint arising out of accounting restatements where the factual allegations of intent to defraud were stronger than alleged here). Indeed, Defendants cite below nearly two dozen cases dismissing analogous or even stronger securities-fraud lawsuits arising out of restatements for failure to allege a strong inference of scienter. The same result should follow here.

The Court need not go further than that, as a failure to sufficiently allege scienter in an accounting restatement case is a threshold pleading failure. Still, if the Court wishes to address alternative grounds for dismissal, it should also dismiss claims regarding allegedly misstated research & development ("R&D") expenses, for failure to plausibly allege "loss causation," as the Complaint fails to connect those alleged misstatements to Plaintiff's August 14 losses.

And because Plaintiff has already twice filed complaints in this matter, and no further amendments would cure the defects identified herein, the dismissal should be with prejudice. *See, e.g.*, *Employ. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 381, 394 (4th Cir. 2023) (affirming dismissal of first amended complaint with prejudice).

2

## BACKGROUND[1]

### I.    Spire Offers a Range of Satellite-Based Data Services, Including a Subscription-Based "Space Services" Platform.

Spire is a global provider of space-based data and analytics headquartered in Vienna, Virginia. (¶¶ 13, 18; Ex. 1 (2023 10-K) at 8.) It was founded in 2012 and became a public company in August 2021 via a merger. (Ex. 1 (2023 10-K) at 8.) Defendant Peter Platzer is a co-founder of Spire and served as Spire's Chief Executive Officer from September 2012 to December 2024, when he handed off the role of CEO to fellow Spire co-founder, Theresa Condor. (¶ 14; Ex. 2 (December 2, 2024 8-K) at 3.) Mr. Platzer is currently the Executive Chairman of Spire's board of directors and remains a Spire employee. (*Id.*) Defendant Leonardo Basola has served as Spire's Chief Financial Officer since September 2023. (¶ 16.) Mr. Basola announced in December 2024 that he will resign as Spire's CFO upon the completion of Spire's restatement of prior period financial statements. (¶ 41; Ex. 2 (December 2, 2024 8-K) at 5.) Defendant Thomas Krywe served as Spire's Chief Financial Officer from August 2021 through September 2023, and will serve as Spire's interim Chief Financial Officer upon Mr. Basola's resignation. (¶ 15; Ex. 2 (December 2, 2024 8-K) at 5.)

---

[1] All citations to "¶" are to the corresponding paragraph in the Amended Complaint (ECF No. 57). All citations to "Ex." are to exhibits attached to the Declaration of Jeffrey P. Justman.

In deciding this motion, the Court may take judicial notice of Spire's publicly available SEC filings, press releases, earnings call transcripts, analyst reports, and investor conference transcripts. *See In re Triangle Capital Corp. Sec. Litig.*, 988 F.3d 743, 745-46 (4th Cir. 2021) (SEC filings, press releases, and earnings call transcripts); *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (analyst reports); *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 544 (4th Cir. 2017) (investor conference call).

The Court may also take judicial notice of Spire's share price history. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004).

Spire commercializes space-based data that it collects from its proprietary constellation of multi-purpose satellites, each of which Spire builds, owns, and operates. (¶ 18; Ex. 1 (2023 10-K) at 8.) Spire's satellites collect and transmit data to Spire's proprietary global ground station network and proprietary data warehouses for cleansing, standardization, fusion, and analysis. (Ex. 1 (2023 10-K) at 8.) The data Spire collects relates to global weather intelligence, ship, and plane movements, and spoofing and jamming detection; customers purchase the data to better predict how their patterns impact economies, global security, business operations and the environment. (*Id.*; ¶ 18.)

Spire offers data in the following segments to customers: Maritime, Aviation, and Weather. (¶¶ 20-21; Ex. 1 (2023 10-K) at 8.) Spire's Maritime business segment provides precise space-based data used for highly accurate ship monitoring, ship safety, and route optimization. (Ex. 1 (2023 10-K) at 77.) Spire's Aviation business segment provides precise space-based data used for highly accurate aircraft monitoring, aircraft safety and route optimization. (*Id.*) Spire's Weather segment provides precise space-based data used for highly accurate weather forecasting. (*Id.*). In most cases—especially in Spire's Maritime, Aviation, and Weather business segments— data provided under Spire's contracts are accounted for as a single performance obligation due to the integrated nature of Spire's space-based data. (*Id.*)

Spire also offers its customers a Space Services solution, or "space-as-a-service," which leverages Spire's operational infrastructure to ***deploy its customers' own applications and sensors into space***. (¶ 21; Ex. 1 (2023 10-K) at 10-11.) Akin to cloud-based services like Microsoft Azure, Spire provides customers fast, scalable, and reliable access to space data by leveraging the same operational infrastructure that Spire uses for its own data and analytics. (Ex. 1 (2023 10-K) at 10-11.) Spire's flexible subscription-based pricing model allows customers to

avoid significant upfront capital expenditures in favor of affordable, recurring operating expenditures. (¶ 22; Ex. 1 (2023 10-K) at 10-11.) Subscription periods are typically non-cancelable, and subscription fees are typically billed either monthly or quarterly in advance. (¶ 22; Ex. 1 (2023 10-K) at 52.)

These Space Services contracts are individualized to the customer, and hence Spire's recognition of revenue from these contracts is highly complex. In Spire's audited annual financial statement for 2023, for example, Spire indicated that for certain Space Services, "project-based performance obligations (e.g., manufacturing and launch phases), revenue is recognized over time, using the output method, specifically contract milestones, which we have determined to be the most direct and reasonable measure of progress as they reflect the results achieved and value transferred to the customer." (Ex. 1 (2023 10-K) at 77.)

## II.      During the Class Period, Spire Reports Its Financial Results and Defendants Periodically Discuss with Investors Revenue Earned from Space Services.

Between May 11, 2022 and August 14, 2024, Spire regularly reported its financial performance to the public through SEC filings, and periodically discussed with investors Spire's financial performance, including its costs and margins, as well as its revenue recognition practices and its internal controls over financial reporting. (¶¶ 54-70, 72-78, 80-88, 90-98, 100-08, 110-14.) This included filings every quarter on Form 10-Q, and annual filings on Form 10-K.

As relevant here, Spire's yearly financial results for 2022 and 2023 were audited by PricewaterhouseCoopers ("PwC"). In annual audits, PwC stated that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America." (Ex. 3 (2022 10-K) at 68; *see also* Ex. 1 (2023 10-K) at 65 (report of PwC confirming

its opinion that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the years then ended in conformity with accounting principles generally accepted in the United States of America").) In addition to PwC, in the fourth quarter of 2022 Spire hired a third-party technical accounting firm to assist with the proper application of GAAP for non-routine, unusual, or complex transactions. (Ex. 1 (2023 10-K) at 98.). As the Complaint tacitly concedes, Spire continues today to avail itself of the services of PwC (as outside auditor) and other third-party accounting experts.

Starting at the beginning of the class period, on May 11, 2022, Spire filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022. (¶ 72; Ex. 4 (Q1 2022 10-Q).) Spire's Q1 2022 10-Q outlined Spire's revenue and gross margin results for the first quarter of 2022, including its costs of revenue and costs of research and development. (¶¶ 72, 80, 90, 100; Ex. 4 (Q1 2022 10-Q) at 6.) Spire's Q1 2022 10-Q also discussed the process by which Spire derives its revenue, highlighting its subscription-based revenue model and how some of its arrangements with its customers include the delivery of specific performance obligations which may impact the timing of revenue recognition. (¶¶ 72; Ex. 4 (Q1 2022 10-Q) at 28.) On the same day it filed its Q1 2022 10-Q, Spire also published a press release describing its Q1 2022 financial performance, wherein it also stated its top-line revenue performance. (¶ 54; Ex. 5 (May 11, 2022 Form 8-K Ex. 99.1) at 4.) Later on May 11, 2022, Spire held an earnings call with investors to discuss its Q1 2022 financial performance, wherein Defendant Krywe discussed Spire's financial performance. (¶ 55; Ex. 6 (May 11, 2022 Spire Earnings Call).)

As is typical with public companies, this sequence of financial reporting and earnings calls was substantially similar over the following quarters, through the first quarter of 2024.

Spire released its quarterly earnings and filed with the SEC a quarterly or annual report outlining the Spire's financial performance, and issued a contemporaneous press release and held an earnings call, in each of **Q2 2022** (¶¶ 56, 57, 73, 81, 91, 101; Ex. 7 (Q2 2022 10-Q); Ex. 8 (August 10, 2022 Form 8-K Ex. 99.1) at 4); Ex. 9 (August 10, 2022 Spire Earnings Call)); **Q3 2022** (¶¶ 58, 59, 73, 82, 92, 102; Ex. 10 (Q3 2022 10-Q); Ex. 11 (November 9, 2022 Form 8-K Ex. 99.1) at 4); Ex. 12 (November 9, 2022 Spire Earnings Call)); **Q4 2022** (¶¶ 60, 61, 73, 74, 83, 93, 103; Ex. 3 (2022 10-K); Ex. 13 (March 8, 2023 Form 8-K Ex. 99.1) at 4); Ex. 14 (March 8, 2023 Spire Earnings Call)); **Q1 2023** (¶¶ 62, 63, 73, 84, 94, 104; Ex. 15 (Q1 2023 10-Q); Ex. 16 (May 10, 2023 Form 8-K Ex. 99.1) at 4); Ex. 17 (May 10, 2023 Spire Earnings Call)); **Q2 2023** (¶¶ 64, 65, 73, 85, 95, 105; Ex. 18 (Q2 2023 10-Q); Ex. 19 (August 9, 2023 Form 8-K Ex. 99.1) at 4); Ex. 20 (August 9, 2023 Spire Earnings Call)); **Q3 2023** (¶¶ 66, 67, 73, 77, 86, 96, 106; Ex. 21 (Q3 2023 10-Q); Ex. 22 (November 8, 2023 Form 8-K Ex. 99.1) at 4); Ex. 23 (November 8, 2023 Spire Earnings Call)); **Q4 2023** (¶¶ 68, 69, 73, 75, 87, 97, 107; Ex. 1 (2023 10-K); Ex. 24 (March 6, 2024 Form 8-K Ex. 99.1) at 4); Ex. 25 (March 6, 2024 Spire Earnings Call)); and **Q1 2024** (¶¶ 70, 73, 78, 88, 98, 108; Ex. 26 (Q1 2024 10-Q); Ex. 27 (May 15, 2024 Form 8-K Ex. 99.1) at 4); Ex. 28 (May 15, 2024 Spire Earnings Call).)

Besides this regular cadence for disclosure of Spire's quarterly and annual financial performance, Spire would occasionally participate in analyst conferences where Spire and its officers would answer questions regarding Spire's business, and in particular regarding the Space Services segment. For example, on March 27, 2023, Spire participated in the Canaccord Conference, and Defendant Platzer was queried regarding Spire's Space Services segment and the nature of Spire's recurring revenue in that segment. (¶ 76; Ex. 29 (March 27, 2023 Canaccord Conference Transcript ("Mar. 27 Conf. Tr.").) Similarly, on November 8, 2023, Defendant

7

Basola made further statements regarding Spire's Space Services segment and Spire's accounting and billing within that segment during the Q3 2023 Spire Earnings Call. (¶ 77; Ex. 23 (November 8, 2023 Spire Earnings Call).)

### III.    During the Class Period, Spire Informs Investors That Deficiencies May Require It to Restate Its Financial Results.

Besides disclosing its financial results during the class period, Spire also repeatedly disclosed the risks related to its internal control over its financial reporting.

For example, in Spire's Q1 2022 10-Q, Spire identified material weaknesses in its internal controls over its financial reporting, specifically identifying Spire's failure to (1) design and maintain an effective risk assessment process to identify new and evolving risks of material misstatement in Spire's financial statements; (2) design and maintain effective controls over the segregation of duties related to journal entries and account reconciliations; and (3) design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the proper application of GAAP of such transactions. (¶ 110; Ex. 4 (Q1 2022 10-Q) at 38-39.) Spire specifically told investors that there was "a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis." (¶ 110; Ex. 4 (Q1 2022 10-Q) at 38.) While Spire acknowledged that it was making progress remediating its material weaknesses in internal control over financial accounting, Spire conceded that there were limitations on the effectiveness of Spire's controls and procedures. (Ex. 4 (Q1 2022 10-Q) at 40.)

Spire made substantially similar statements regarding the material weaknesses in its internal controls over its financial reporting in each of the following quarters during the class period, including **Q2 2022** (¶ 111; Ex. 7 (Q2 2022 10-Q) at 45-47); **Q3 2022** (¶ 112; Ex. 10 (Q3 2022 10-Q) at 49, 51); **Q4 2022** (¶ 113; Ex. 3 (2022 10-K) at 40-41, 106-08); **Q1 2023** (¶ 114;

8

Ex. 15 (Q1 2023 10-Q) at 39-41); **Q2 2023** (¶ 114; Ex. 18 (Q2 2023 10-Q) at 45, 47); **Q3 2023** (¶ 114; Ex. 21 (Q3 2023 10-Q) at 45, 47); **Q4 2023** (¶ 114; Ex. 1 (2023 10-K) at 39-40, 96-98); **Q1 2024** (¶ 114; Ex. 26 (Q1 2024 10-Q) at 44, 46).

**IV.** **On the Last Day of the Class Period, August 14, 2024, Spire Discloses That It Would Be Delaying Filing Its Quarterly Results Because of Accounting Deficiencies with How It Recognizes Space Services Revenue, and Its Stock Price Falls.**

On August 14, 2024, Spire filed with the SEC a notification of late filing on Form 12b-25, stating that it was unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2024 within the prescribed time period without unreasonable effort and expense. (¶ 33; Ex. 30 (August 14, 2024 12b-25) at 2.) Spire explained that it was in the process of reviewing its accounting practices and procedures with respect to revenue recognition related to certain Space Services contracts under applicable accounting standards and guidance. (*Id.*) It further clarified that Spire was considering any related internal control matters associated with these Space Services contracts. (*Id.*) Spire explained that the Space Services contracts identified for re-evaluation resulted in recognized revenue of $10-15 million on an annual basis. (*Id.*) While Spire warned that additional financial measures such as gross profit could also be impacted, it made clear that the re-evaluation of its revenue recognition for these Space Services contracts would not impact Spire's statement of cash flows for any period. (*Id.*)

Spire's accounting practices and procedures at issue included an analysis as to Spire's adherence and compliance with accounting standard ASC 606, which governs the recognition of revenue from contracts with customers. (¶ 45.) With complex, long-term agreements such as the Space Services contracts at issue here, knowing how and when to recognize revenue can be complicated, considering the number of moving parts and different obligations underpinning these arrangements. When reacting to the news of Spire's late filing notification, analysts covering Spire noted that revenue recognition for Space Services "is notably complex" and that

9

there "is considerable complexity" around payments and revenue recognition in connection with these agreements. (*See, e.g.*, Ex. 31 (August 15, 2024 Craig-Hallum Analyst Report) at 2.)

On August 15, 2024, the day following Spire's 12b-25 notification of late filing, Spire's stock price closed at $6.75 per share, falling 33.56% during the day's trading. (¶¶ 34, 117).

## V.    Spire Continues to Update Investors About the Accounting Issues and Its Stock Price Quickly Recovers.

### A.    On August 27, 2024, Spire Announces That It Will Restate Its Financials to Correct Any Technical Misstatements of Space Services Revenue.

On August 27, 2024, Spire announced that it had determined that its accounting for certain Space Services contracts, including primarily revenue and cost recognition timing for pre-space mission activities (*i.e.*, activities before a satellite is launched), was incorrect and that certain previously issued financial statements needed to be restated to remove certain previously recorded pre-space mission activity revenue from the period in which pre-space mission activities were performed under these contracts, and instead, record that revenue over the period in which data was delivered. (¶ 35; Ex. 32 (August 27, 2024, 8-K) at 3.)

Spire's stock price did not materially change following this announcement, closing the following day down only $0.15, or 1.5% from the day prior. (Ex. 33 (Stock Price Chart).)

### B.    Spire's Stock Recovers to its August 14, 2024 Level Within Weeks.

In the days following the August 14, 2024 notification of late filing, Spire's stock price began to rebound from its August 15, 2024 decline. By September 17, 2024—only 23 trading days following the August 15, 2024 decline—Spire's closing share price had entirely rebounded to higher than its August 14, 2024 close. (Ex. 33 (Stock Price Chart).) As of January 17, 2025, Spire's stock price is $17.98, nearly two times higher than the August 14, 2024 close. (*Id.*)

10

C.    **On November 4, 2024, Spire Further Updates Investors About the Space Services Accounting Review and Also Notes that It Is Reviewing How It Treats R&D Expenses Related to Government Contracts.**

On November 4, 2024, Spire filed with the SEC a notification of late filing on Form 12b-25, stating that it was unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2024 within the prescribed time period without unreasonable effort and expense. (¶ 37; Ex. 34 (November 4, 2024 12b-25) at 2.) Spire explained that it plans to restate its quarterly and annual financial statements for each quarter from Q1 2022 to Q1 2024. (*Id.*) Additionally, Spire announced that its evaluation of an "embedded lease" issue—to determine whether there were any space contracts with improperly embedded leases—concluded that most of its satellites did *not* have embedded leases. (*Id.*) Separately, Spire announced that it had recently initiated a review of certain R&D contracts, and that the full costs associated with these contracts would be reclassified from "research and development" to "cost of revenue" within gross profit on the face of the consolidated statements of operations. (*Id.*)

Spire's stock price did not materially change following this announcement, closing the following day down only $0.11, or 1.0% from the day prior. (Ex. 33 (Stock Price Chart).)

VI.    **Before Spire Issues Any Restatements, Plaintiff Files Her Complaint.**

On August 20, 2024, Plaintiff Michal Bousso filed an initial Complaint. *See* ECF No. 1. After the Court appointed Lead Plaintiff and Lead Counsel, *see* ECF No. 49, Lead Plaintiff Bousso filed an Amended Complaint on December 23, 2024. *See* ECF No. 57. The Amended Complaint makes no specific allegations regarding the content of Spire's restatement of its financials, because as of the date of the Amended Complaint, Spire had not yet issued any restatement of its financials.

11

**ARGUMENT**

Complaints alleging federal securities fraud violations are subject to pleading standards that are among the highest in American civil law. In 1995, Congress passed the Private Securities Litigation Reform Act (PSLRA) to weed out meritless securities-fraud lawsuits, which are often filed shortly after public company announcements resulting in stock-price drops. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (describing purpose of PSLRA); *Boykin v. K12, Inc*., 54 F.4th 175, 182 (4th Cir. 2022) (heightened pleading requirements address the problem of suits being routinely filed "whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability"). The PSLRA's pleading standard is even stricter than the already heightened standards for pleading fraud under Rule 9(b). *See Maguire Fin., LP v. PowerSecure Int'l, Inc*., 876 F.3d 541, 546 (4th Cir. 2017).

To state a claim under Section 10(b), Plaintiff must allege that each Defendant (1) made a material misrepresentation or omission; (2) with scienter, *i.e*., an intent to defraud; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014). "These elements can be addressed in any order, and the failure to adequately allege scienter is enough to doom the claim." *KBC Asset Mgmt. NV v. DXC Tech. Co*., 19 F.4th 601, 607 (4th Cir. 2021). Here, Defendants focus on the Complaint's failure to adequately plead the second element, scienter.

To satisfy the PSLRA's scienter requirement, the complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *In re Triangle Capital Corp. Sec. Litig*., 988 F.3d 743, 751 (4th Cir. 2021). Scienter is measured at the time of the allegedly misleading statement,

12

*Triangle*, 988 F.3d at 752-53, and requires "a mental state embracing [an] intent to deceive, manipulate, or defraud," *id*. at 751. To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Applying the PSLRA, courts in this circuit routinely "screen out" securities suits at the motion-to-dismiss stage for failure to plead scienter under the PSLRA's demanding standards. *Boykin*, 54 F.4th at 182; *see also, e.g.*, *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242 (4th Cir. 2023) (affirming dismissal of securities fraud suit); *KBC*, 19 F.4th at 608-14 (same); *Triangle*, 988 F.3d at 751-56 (same); *Maguire*, 876 F.3d at 547-51 (same); *Yates*, 744 F.3d at 885-94 (same). This includes cases arising out of stock-drops following accounting restatements or revenue recognition issues—including (as described below) restatements that are much more significant and with more substantial allegations than Plaintiff makes here. *See, e.g.*, *Yates*, 744 F.3d 874; *Ottman v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338 (4th Cir. 2003); *Firemen's Ret. Sys. of St. Louis v. Telos Corp.*, 2023 WL 1512207 (E.D. Va. Feb. 1, 2023); *Knurr v. Orbital ATK, Inc.*, 272 F. Supp. 3d 784 (E.D. Va. 2017); *Proter v. Medifast, Inc.*, 2013 WL 1316034 (D. Md. Mar. 28, 2013).

## I.    Plaintiff Fails To Plead Specific Facts Giving Rise To A Strong Inference Of Scienter.

Plaintiff's Complaint fails because it pleads ***no facts*** "strong[ly]" suggesting that any Defendant acted with the "intent to deceive, manipulate, or defraud" investors. *Triangle*, 988 F.3d at 751.

In evaluating whether a plaintiff sufficiently alleges scienter, "[c]ourts must compare the malicious and innocent inferences cognizable from the facts pled . . . and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as

13

any opposing innocent inference." *KBC*, 19 F.4th at 608. "If the more compelling inference is that Defendants merely acted negligently or non-fraudulently," the Court must "dismiss[] for lack of scienter." *Id*. In weighing competing inferences, courts "review the facts 'holistically' and afford them the 'inferential weight warranted by context and common sense.'" *Triangle*, 988 F.3d at 751; *see Tellabs*, 551 U.S. at 326.

Here, even though the Complaint spans 164 paragraphs, there are twelve meager paragraphs that purport to allege any scienter. (¶¶ 119-30.) Nothing in those paragraphs, or anywhere else in the Complaint, comes close to raising a strong inference of scienter. The worst possible inference from those allegations is that Defendants could "have been negligent in failing to properly apply" GAAP accounting standards "to their business in the first instance." *Yates*, 744 F.3d at 887, 893. Because that inference is insufficient to show an intent to commit *fraud*, dismissal must likewise follow.

A.    **To Start, Because Plaintiff Does Not Allege Any Plausible Motive for Defendants to Commit Fraud, Its Other Scienter Allegations Must Be "Correspondingly Greater."**

As an initial matter, Plaintiff faces an even *higher* hurdle to reaching a strong inference of scienter because of what the Complaint does *not* plead: any reason why any Defendant would intentionally lie to investors.

1.    **Complaints lacking motive allegations face a high bar.**

Securities-fraud complaints are usually anchored by allegations explaining *why* the defendants would want to defraud investors and artificially boost the company's stock price, *i.e.*, "motive" allegations. For example, plaintiffs often point to "'suspicious' insider selling or other kinds of self-dealing," such as allegations that the defendant "would personally benefit from a special bonus" tied to the stock maintaining a particular price. *Boykin*, 54 F.4th at 186; *see, e.g.*, *Yates*, 744 F.3d at 890 (complaint alleged that "Company insiders were motivated to conceal [the

14

Company's] accounting problems to improperly benefit from insider trading"); *Telos*, 2023 WL 1512207, at *10 (same); *Knurr*, 272 F. Supp. 3d at 809-10 (same, plus allegations that defendants "needed [a] merger to proceed").

Complaints that don't contain *any* motive allegations face a high bar: courts "generally do not presume" that executives would fraudulently tout business lines or revenues "that they knew were doomed to fail without some ulterior financial motive." *Syneos*, 75 F.4th at 242. If a plaintiff fails to "put forward [a] plausible motive for why Defendants sought to defraud investors," the Fourth Circuit has held that that "omission . . . weighs *heavily against* them in the scienter analysis," and the plaintiff's other "circumstantial evidence of fraud must be correspondingly greater." *Id.* (emphasis added); *see also Triangle*, 988 F.3d at 752.

That is the exact situation here. Plaintiff alleges *zero* motive allegations. No suspiciously timed stock sales. No special executive bonuses. No golden parachutes. No special need to secure additional financing. Without any allegations of motive to lie, the Complaint's circumstantial evidence of scienter must be "correspondingly greater." *Id.*; *see also Boykin*, 54 F.4th at 186 (rejecting inference of scienter where the plaintiffs did not "connect the dots for why a lagging stock price would have motivated defendants to commit securities fraud," and describing as "unpersuasive" the theory that defendants would "undermine their long-term credibility—and risk considerable bad press—just to pump up [the company's] share price for a few months").

### 2.    The Complaint falls far short of alleging any fraudulent motive.

The closest the Complaint comes to a motive allegation is a passing suggestion that Defendants had a desire to "report[] strong revenue growth and profitability," and to "tout[] their ability to control costs." (¶¶ 28-32.) But if this can be read to address a motive, it is not a motive to commit fraud, for several reasons.

First, courts will not "infer fraud from financial motivations common to every company." *Yates*, 744 F.3d at 891. And a desire to report increasing revenues and low costs is unquestionably a motive held by every company. *Cf. Triangle*, 988 F.3d at 754 (rejecting as insufficiently "generalized" the motive "to keep share prices and dividends high in order to attract more investors").

Second, the absence of a fraudulent motive is particularly evident here because the Space Services accounting issue merely concerned *when* Spire recognized **legitimate** revenues. As Plaintiff concedes, to the extent Spire erred, it was in "*prematurely*" "recognizing revenue on Space Services contracts." (¶ 32 (emphasis added).) There is no allegation that Spire reported "non-existent" or "illusory" revenues. *Cf. Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1350 (N.D. Ga. 2017) (recognizing this distinction). Plaintiff's allegations are that Space Services revenues will merely be shifted from one quarter (or year) on the balance sheet to another; the restatement is not expected to "impact the Company's statements of cash flows for any period." (¶¶ 33, 35; *see also* Ex. 35 (November 14, 2024 Craig-Hallum Report) at 4; ¶ 40 (confirming that the restatement will "not affect cash flow[s]," but rather "revenue recognition pushing out" to future quarters).)

Courts confronted with technical accounting *timing* allegations like these agree that, absent allegations "suggesting how Defendants would benefit from the manipulation of the period in which revenue was recognized," a motive to defraud cannot be drawn from such errors. *In re Medicis Pharm. Corp. Sec. Litig*., 689 F. Supp. 2d 1192, 1200, 1207, 1209 (D. Ariz. 2009) (dismissing securities complaint based on analogous revenue-recognition restatement when revenue was merely "shifted" from one time period to another); *see also, e.g.*, *Steinberg v. Schmitt Indus., Inc.*, 2024 WL 1007879, at *17, *19-20 (D. Ore. Feb. 2, 2024) (same, where the

16

"restatement merely redistributed general and operating expenses among three quarters"); *Proter*, 2013 WL 1316034, at *3-5, *13-15 (same, and noting that revenue-recognition timing errors are "far less severe" than cases where (unlike here) the company "falsely present[s]" losses as "profits"); *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1221 (W.D. Wash. 2009) (similar, and noting that "scienter requires more than a misapplication of accounting principles"); *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 350-53 (W.D. Tenn. 2001) (similar). Plaintiff identifies no such benefit here. This further underscores the lack of a plausible fraud motive.

Third, Plaintiff's motive allegations are even weaker than other comparable cases in this Circuit. In *Yates*, the Fourth Circuit affirmed dismissal of securities-fraud claims involving multiple restatements and scienter allegations that were much more robust than Plaintiff alleges here. 744 F.3d at 883, 889, 901. As evidence of scienter, the complaint in *Yates* included multiple confidential witness statements setting forth allegations concerning the defendant executive's knowledge *and* detailed insider stock-sale allegations. *Id.* at 885-91. The Fourth Circuit held that these allegations were insufficient to show either motive specifically or scienter generally. *Id.* Instead, the "more compelling [] inference [was] that the [] defendants were, at most, negligent" in "fail[ing] to have sufficient accounting controls and processes in place[.]" *Id.* at 893.

Similarly, in *Telos*, this Court dismissed securities-fraud claims based on the Defendant company's failure to maintain appropriate internal controls. Like here, the Plaintiff in *Telos* alleged securities fraud when the Defendant had failed to maintain internal controls over the recognition of revenue from contracts with customers under Accounting Standards Codification ("ASC") Topic 606. 2023 WL 1512207, at *2. The *Telos* Plaintiff sought to allege scienter by

17

pleading, *inter alia*, that the defendants engaged in over $270 million in insider stock sales during the purported class period. *Id*. at *9-10. This Court rejected that argument and dismissed the case, holding that "Defendants' individual sales of stock, in and of themselves, do not allow a sufficiently strong inference that the Defendants had the intent to realize a profit based on fraud." *Id*. at *10.

If the *Yates* and *Telos* allegations were insufficient to show scienter, and Plaintiff fails to include *any* motive allegations here, then it is implausible *a fortiori* that Plaintiff has sufficiently alleged scienter. At the least, the lack of plausible motive allegations "weighs heavily against" Plaintiff "in the scienter analysis," and Plaintiff's other "circumstantial evidence of fraud must be correspondingly greater." *Syneos*, 75 F.4th at 242.

**B.      Plaintiff's Scant Scienter Allegations Do Not "Strongly" Suggest that Defendants Acted With Scienter.**

In her attempt to establish fraudulent intent, Plaintiff relies on: (1) the allegedly "core" role Space Services revenue played in Spire's business; (2) certain statements Platzer made about Space Service revenue to investors; (3) Platzer's December 3, 2024 "role change" from CEO to Executive Chairman; and (4) Spire's repeated admissions of "material weaknesses" in its accounting. (¶¶ 119-29.) Plaintiff also (5) makes a conclusory allegation of "corporate scienter." (¶ 130.) Even viewed collectively, these allegations "fall[] far short" of creating a "strong inference" of scienter on any of the Defendants' parts. *Syneos*, 75 F.4th at 242.

**1.      Plaintiff's "core operations" allegations do not give rise to any inference of scienter.**

Plaintiff contends that the Court should infer that the Individual Defendants "were aware of" the Space Services revenue-recognition issues at the time they made the alleged misstatements because  "analysts estimated that Space Services accounted for as much as 25% of Spire's revenue." (¶121.)

This allegation invokes what the Fourth Circuit has called the "core operations" doctrine. *See, e.g.*, *Yates*, 744 F.3d at 890; *Syneos*, 75 F.4th at 242-43; *KBC*, 19 F.4th at 612. Under this doctrine, if an alleged fraud affected "a core business of the Company," it *may* be "relevant to the court's holistic analysis of scienter," *Yates*, 744 F.3d at 890, because executives are "more likely to know that" statements relating to their company's "core operations" were false when made, *KBC*, 19 F.4th at 612. But the doctrine does not apply here, for two reasons.

First, the Complaint includes no particularized allegations explaining why *Space Services accounting practices* should be considered a "core" Spire business function, such that contemporaneous executive knowledge of the practices should be presumed. Not only are "accounting and related tax determinations . . . not part of a company's core operations" as a general matter, *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *31 (C.D. Cal. Apr. 14, 2015) (collecting cases), but also Space Services is not the entirety of Spire's business: as noted, Spire generates significant revenue in several other segments, including aviation, weather, and maritime. (¶ 28.) What's more, the amount of revenue Spire currently estimates the Space Services restatement will affect is only a fraction of Spire's total annual revenues: "$10 to $15 million," against annual revenues of $105 million. (¶¶ 33, 35, 68.)

Where "the practical effect of proper consolidation on the Company's financial statements [is] relatively small," a core-operations scienter inference is greatly weakened. *Yates*, 744 F.3d at 889 (applying this reasoning where the restatement resulted in a "$44.9 million" adjusted loss in stockholders' equity, against a total "adjusted shareholders equity [of] approximately $723 million"); *see also, e.g.*, *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 116 (3d Cir. 2018) (restatements affected only "9.97% [to] 32.12%" of the defendant's annual income); *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (accounting errors impacted

19

"a relatively minor portion of the company's overall business"); *Ixia*, 2015 WL 1775221, at *31 (at-issue revenue "accounted for less than 20% of [the defendant's] overall quarterly revenue"); *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021) (the core operations doctrine applies "only where the operation in question constitute[s] nearly all of a company's business"). Space Services accounting can thus hardly be classified as a "core" operation.

Second, even assuming that accounting for Space Services revenue was a "core operation" of Spire, *Yates* made clear that the doctrine does not apply to restatement cases like this one, unless the complaint includes "*detailed* allegations establishing the defendants' *actual exposure* to [i.e., awareness of] the accounting problem." *Yates*, 744 F.3d at 890 (emphasis added); *accord Knurr*, 272 F. Supp. 3d at 800-01. The Complaint includes no such allegations here, and hence it cannot apply. *See KBC*, 19 F.4th at 612 (rejecting core-operations theory because plaintiffs failed to plead "particularized allegations regarding Defendants' knowledge of shortcomings regarding the digital space and investments," and hence were "simply asking us to assume scienter because part of [the company's] business plan was not going smoothly. This we cannot do.").[2]

---

[2] To the extent Plaintiff argues that the anonymous "former employee" allegations raised in a separate, non-scienter part of the Complaint bears on this inquiry (¶ 53 ("FE1 Allegations")), those allegations are likewise insufficient. The Fourth Circuit urges lower courts to be skeptical of anonymous allegations like these as a general matter. *See KBC*, 19 F.4th at 609; *Yates*, 744 F.3d at 886. And such skepticism is particularly warranted here, for many reasons:

FE1 left Spire over a year before the restatements were announced. (¶ 53 n.1.) And his allegations only describe anecdotal experiences with undefined "R&D expenses." The allegations do not clearly relate to the accounting issues that gave rise to the restatements, *i.e.*, Space Services revenue recognition and *government contract* R&D expenses. Nor do the allegations suggest that the *Individual Defendants* knew anything about the issues FE1 describes. Indeed, FE1 concedes that he worked multiple levels below the Individual Defendants. (*Id.*) The Court should accordingly pay the FE1 Allegations little heed when evaluating scienter. *See, e.g.*, *KBC*, 19 F.4th at 609 (FE allegations did not support scienter when they did "not allege that they

20

### 2.    Platzer's statements to investors about Space Services revenue do not give rise to any inference of scienter.

Plaintiff's next observes that, on two occasions, Platzer generally analogized Spire's revenues to "subscription" services for "power and data," and suggests that these statements "underscore[] that" Defendants "knew or should have known that" Spire was incorrectly recognizing Space Services revenues under Topic 606. (¶¶ 122-23.) Not so.

For starters, there are three Individual Defendants who allegedly made misstatements: Platzer, Krywe, and Basola. (¶¶ 14-16; ¶¶ 54-115.) Platzer's alleged knowledge of Spire's accounting issues says nothing about Krywe or Basola's knowledge of those issues. *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 685 (E.D. Va. 2015) ("To the extent a plaintiff alleges fraud claims against individual defendants, the plaintiff must allege facts supporting a strong inference of scienter as to *each* defendant."); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 594-95 (E.D. Va. 2006) ("group pleading is insufficient to plead" fraud). Nothing from Platzer's mouth speaks to alleged scienter in Basola's or Krywe's heads.

More to the point, nothing in the cited statements suggests Platzer knew anything about how Spire was booking Space Services revenue *under GAAP*—much less whether Spire's Space Services revenue-recognition practices *complied with* GAAP or were incorrect. "[K]nowing an accounting rule and knowing that it is not being followed by your company's accountants are two different things." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1166 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018). And here, Platzer's statements don't even demonstrate awareness of any relevant accounting rules. Rather, Platzer simply offered a high-level description of the Space Services business model and the reasons why he

---

passed their concerns on to [the defendants] or that the individual Defendants were otherwise aware of the problems alleged").

believed Space Services revenues were fairly characterized as "subscriptions." (*See* ¶ 122; Ex. 29 (Mar. 27, 2023 Conf. Tr.) at 11; *cf.* Ex. 36 (May 31, 2023 Conference Transcript) at 7-8 (answering analyst questions about Spire's "maritime custody service" revenues).) The statements do not evidence knowledge of the revenues' GAAP-compliance, or lack thereof.

Nor is there anything else in the Complaint that would allow the Court to infer that Platzer knew that anything about Spire's accounting was incorrect. CEOs "oversee[] *all* of" their respective companies; they rarely, if ever, "kn[o]w the ins and out of GAAP's rules[.]" *Baxter*, 2021 WL 100457, at *18. Given that, the only reasonable inference is that Platzer "assumed that" Spire's revenue-recognition practices were "GAAP-compliant, as a company presumably would not intentionally put itself in a position to issue false or misleading financial statements as a matter of course," and spoke throughout the class period with that assumption in mind. *Id.* at *14 (adopting this assumption when confronted with similar allegations, and finding no scienter).

### 3. Platzer's "planned transition" from CEO to Executive Chairman does not give rise to any inference of scienter.

Plaintiff next attempts to create an inference of scienter based on the allegation about Platzer's "removal" as CEO after the class period ended, on December 3, 2024. (¶¶ 124-25.) To Plaintiff, this announcement somehow suggests that the Individual Defendants "had knowledge of" the accounting errors at the time of the alleged misstatements. (*Id.*) For multiple reasons, this allegation does not support *any* inference of scienter.[3]

For starters, Plaintiff ignores critical language in the Form 8-K announcing the leadership changes, where Spire unambiguously explained to investors what the role change was, and what

---

[3] Again, Platzer's role change from CEO to Executive Chairman says nothing about Krywe or Basola's scienter. *See Neustar Sec.*, 83 F. Supp. 3d at 685. Indeed, Krywe left Spire over a year before Platzer changed roles. (¶ 15; Ex. 37 (May 17, 2023 press release announcing Krywe's departure, so that he could "return to working with private companies")).

it wasn't. Spire's filing is clear: "[t]he removals of Mr. Platzer and Ms. Condor from their current positions with the Company were not because of any disagreement relating to the Company's operations, policies, practices, financial reporting or controls." (Ex. 2 (December 2, 2024 8-K) at 3.) Plaintiff cannot imply scienter for reasons Spire expressly disclaimed.

Regardless, even without this language directly contradicting Plaintiff's scienter allegations, "executive departures are, at best, weak evidence of scienter." *Syneos*, 75 F.4th at 244. "[W]ithout allegations demonstrating" the departing executive's "contemporaneous knowledge that" their previous statements were materially misleading, courts "find it difficult to give [] regime change [allegations] any weight toward a scienter inference." *Triangle*, 988 F.3d at 753-54 (rejecting similar executive departure allegations); *Syneos*, 75 F.4th at 244 (same). And here, the Complaint includes no allegations suggesting Platzer knew, at the time of the alleged misstatements, that Spire's Space Services revenues or government contract R&D expenses failed to comply with GAAP.

Nor is there any other reason "to read anything nefarious into [this] leadership change[]." *Syneos*, 75 F.4th at 244. The press release referenced in the Complaint makes clear that Platzer's removal was part of a "planned leadership transition." (Ex. 38 (December 3, 2024 Form 8-K, Ex. 99.1) at 32.) As the press release explains, Platzer is simply transitioning from CEO to "Executive Chairman" of Spire's Board, where he will "guide Spire's vision and . . . focus on securing major opportunities to drive the Company's growth strategy." (*Id.*) The press release not only says nothing "connecting" Platzer's departure "to the alleged fraud," but as set forth above, makes the opposite assertion. *Hertz*, 905 F.3d at 118-19. And because Platzer is staying on as Executive Chairman, there really isn't any "departure" from which to infer scienter at all.

23

Suffice it to say, when a removed executive "remain[s] at [the company] in some type of advisory role . . . the most reasonable inference is that [their] departure[] w[as] benign." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062-63 (9th Cir. 2014) (rejecting similar allegations and affirming dismissal for lack of scienter); *Steinberg*, 2024 WL 1007879, at \*18 (same). So too here. Indeed, as noted, Platzer is remaining in much more than an advisory role: he is the "Executive Chairman." (Ex. 38 (December 3, 2024, Form 8-K Ex. 99.1) at 32.)

Finally, there is one additional fatal flaw with the notion that Platzer's role change gives rise to any inference of scienter: Platzer was granted a large cash "recognition bonus" by Spire's compensation committee within a week of the announcement the leadership change. (Ex. 39 (December 16, 2024 Form 8-K) at 3.) Management changes do not "support a strong inference of scienter" where, as here, a former CEO not only stays on with the defendant "as its Executive Chairman of [Defendant's] Board of Directors," but also is granted a "genero[us] . . . compensation package[.]" *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1155 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020). It is "unreasonable to infer that by retaining [former CEO] in a high-profile, well-paid position, [Defendant] was punishing [former CEO] for fraudulent conduct." *Id*. That exact logic applies here, and further undermines any inference of scienter from Platzer's role change.

### 4. Spire's candid disclosures of material weaknesses in accounting help Defendants, not Plaintiff.

Plaintiff next attempts to infer scienter based on Spire's disclosures "throughout the Class Period," that it had "internal control deficiencies" with respect to *other* accounting issues. (¶¶ 126-29; *see also, e.g.*, ¶ 110-11 (disclosing inadequate controls related to "warrant instrument[]" and "business combination" accounting), ¶ 112 (same, with respect to "contingent earnout liability" accounting), ¶¶ 113-14 (noting a "lack[]" of "sufficient number of professionals with

24

an appropriate level of internal controls and accounting knowledge").) Plaintiff alleges that, somehow, one can infer from these disclosures that the Individual Defendants "already knew about" the Space Services and R&D accounting issues at the time of the alleged misstatements, "or, at a minimum, were reckless in not knowing about" those issues. (¶ 128.) Plaintiff is again incorrect, for multiple reasons.

First, that Spire disclosed material weaknesses on other topics during the Class Period does not provide any basis to suggest that Defendants *knew* about any of the issues which caused the need to restate, much less that Defendants were *fraudulently hiding* such problems from investors. If anything, the disclosures weigh *against* a finding of scienter because the only reasonable inference drawn from the disclosure is that Defendants were "act[ing] in good faith" "to keep investors updated about [the Company's] internal weaknesses." *Yates*, 744 F.3d at 892-94 (affirming a finding of no scienter where company similarly issued "successive disclosures" regarding "newly discovered material [accounting] weaknesses"); *KBC*, 19 F.4th at 613 ("[W]hen defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter."); *Telos*, 2023 WL 1512207, at *10 (same). "[R]epeated disclosure of negative information . . . throughout the Class Period," in other words, "contradicts [a plaintiff's] theory that Defendants sought to conceal" bad news from investors. *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282 (S.D. Fla. 2017).

Indeed, it makes little sense to infer a fraudulent intent from the cited disclosures because, in each, Spire emphasized that, while it was taking "remediation efforts" to improve the noted weaknesses, there were "limitations on [the] effectiveness of [its] controls and procedures." (*See, e.g.*, Ex. 3 (2022 10-K) at 106-08; Ex. 10 (Q3 2022 10-Q) at 49-51; Ex. 4 (Q1 2022 10-Q) at 38-40.) As such, Spire consistently warned investors that "other[]" "weaknesses in

25

. . . our internal controls . . . may be discovered in the future," and "may result in a restatement of our financial statements for prior periods." (*See, e.g.*, Ex. 3 (2022 10-K) at 39; Ex. 10 (Q3 2022 10-Q) at 78-79; Ex. 4 (Q1 2022 10-Q) at 68.) Spire thus repeatedly disclosed to investors the *very risk* that Plaintiff claims Defendants hid from them. This fact "further strengthens the competing inference of innocence." *Triangle*, 988 F.3d at 755-56 (in which the Fourth Circuit noted analogous "br[oad] risk disclosures" in finding no scienter).

### 5.    Plaintiff's "corporate scienter" allegations fail.

To the extent Plaintiff argues that the Court can infer that Spire acted with scienter *without* showing that any one individual acted with scienter (¶ 130), Plaintiff is wrong. "To the extent a plaintiff alleges corporate fraud, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Yates*, 744 F.3d at 885; *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020); *Baxter*, 2021 WL 100457, at *20-21. The only authorized agents of Spire who are alleged to have made "misstatements" are the Individual Defendants. Thus, if Plaintiff fails to allege that the Individual Defendants acted with scienter, it fails to allege that Spire acted with scienter.

### C.    The More Cogent and Compelling Inference Is That Defendants Disclosed Accounting Problems Once They Became Known And Promptly Endeavored To Correct Them In Good Faith.

"Given the weakness of Plaintiff's inference[s]" of fraud, as set forth above, "the final step of the comparative analysis is easy": the "more compelling inference" is that, to the extent Defendants materially misstated Spire's financials, those errors stemmed from (at worst) accounting negligence, *not* an intentional effort by the Defendants to defraud investors. *Syneos*, 75 F.4th at 244. This flows inexorably from several factors that squarely cut *against* scienter.

26

### 1.    Plaintiff's failure to allege net sales of Spire stock by the Individual Defendants negates an inference of scienter.

Notably, the Complaint is completely silent on a fact that securities-fraud plaintiffs usually address: whether defendants were net sellers of company stock during the class period. If defendants sold more than they purchased, plaintiffs sometimes argue that that gives rise to an inference of scienter. But if defendants purchase more than they sold, there can be no inference of scienter: why would defendants lie to artificially inflate the value of company stock and then purchase or acquire it, knowing they would suffer losses when the price dropped later?

This case falls comfortably into the net-purchases category, which completely negates any inference of scienter. The Complaint is silent on stock purchases, which (as discussed above), shows that there was no motive to defraud. *See, e.g.*, *Jackson Inv. Grp.*, 325 F. Supp. 3d at 1351 (that neither defendant "is alleged to have sold any stock . . . negates an inference of scienter").

But more than that, publicly available SEC filings show that each of the Individual Defendants were net acquirers of company stock during the Class Period. This fact not only weakens Plaintiff's allegations—it "negates an[y] inference of scienter." *Hilb Rogal*, 432 F. Supp. 2d at 594; *see also, e.g.*, *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) (holding that where, as here, "public filings submitted by Defendant indicate that during the class period, all of the Defendants, including Limited itself, purchased shares of Limited Stock," these "purchases undermine any inference of scienter"); *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1141 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ("The fact that Defendant Gilkey purchased stock during the Class Period—at the time he was allegedly engaged in securities fraud—is 'wholly inconsistent with fraudulent intent.'"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y.

27

2004) (defendants' increase in stock holdings during the class period was a "fact wholly inconsistent with fraudulent intent").

To confirm as much, Defendants are submitting with this motion SEC filings showing the Individual Defendants' stock purchases and sales during the Class Period, along with a table showing that each Individual Defendant was a net acquirer of Spire stock during the Class Period. (*See* Exs. 40-81; Justman Decl. ¶ 4.) The source of the information in the table is Spire's Form 4 SEC filings, of which this Court can take judicial notice. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005). Thus, just as in *Hilb Rogal*, the Individual Defendants' stock purchases negate any inference of scienter.

### 2.      Approval of Spire's financial statements by Spire's auditor undermines any inference of scienter.

Next, the more plausible inference is that Defendants had *no* intent to mislead, because Spire's auditor, PwC, vetted and approved its annual financial statements. (*See* Ex. 1 (2023 10-K) at 65 (signed attestation from auditor stating that the financials "conform[ed] with accounting principles generally accepted in the United States of America"); Ex. 3 (2022 10-K) at 68 (same).) What's more, in the fourth quarter of 2022 Spire retained a third-party technical accounting firm to assist with the proper allocation of GAAP for non-routine, unusual, or complex transactions. (*See* Ex. 1 (2023 10-K) at 98.)

"[I]t cannot at once be the case that the accounting errors were simple, clear-cut determinations *and*, at the same time, that the Company's independent auditors repeatedly failed to discover those 'obvious' errors. . . . Such a glaring *non sequitur* undermines any inference of scienter." *Proter*, 2013 WL 1316034, at *15. Indeed, when "independent accounting professionals approve a particular practice," even "individual[s] with accounting experience" are not "necessarily [] aware of GAAP violations." *Knurr v. Orbital ATK, Inc.*, 294 F. Supp. 3d 498,

506 (E.D. Va. 2018); *accord Webb*, 884 F.3d at 857 (affirming conclusion that defendants lacked scienter where "the accounting error was so subtle that it appears even the company's specialized accounting division and professional auditors missed it").

Thus, as many courts have held, that Spire's accounting had been applied for years "without being flagged by [Spire's] independent auditor" "undermines" the inference of scienter. *Baxter*, 2021 WL 100457, at *14; *see Medicis*, 689 F. Supp. 2d at 1206 (similar); *Ixia*, 2015 WL 1775221, at *33 (similar); *Kohl's*, 266 F. Supp. 3d at 1167 (similar); *Jackson Inv. Grp.*, 325 F. Supp. 3d at 1350 (similar).

Indeed, outside auditors are required under federal law to report material illegal acts to company management and the audit committee, and, if not rectified, to the SEC. *See* 15 U.S.C. § 78j-1(b). The Complaint does not allege that PwC or other auditors expressed any concern prior to Spire's August 2024 announcement that it would need to file an accounting restatement, and that failure likewise "undermines an inference of fraudulent intent." *Kohl's*, 266 F. Supp. 3d at 1168. Or as the Fourth Circuit put it, any inference of wrongful intent is "further weakened by the fact that PwC made clear" to the SEC that it had "no disagreements with the Company on any matter of accounting principle or practice that it felt obligated to report." *Yates*, 774 F.3d at 889.

### 3.    The complexity of the accounting issues further undermines any inference of scienter.

Beyond the mere fact of auditor approval, any inference of scienter is further undermined by the complexity of the accounting issues that necessitated the restatement.

Here, the Complaint alleges that Spire failed to comply with ASC Topic 606, the accounting standard for how to recognize revenue from contracts. (¶¶ 45-48.) But what the Complaint fails to allege is that there was *any* reasonable comparator for how to recognize

29

revenue from contracts that required development, manufacturing, and sending customized satellites *into space*. Even for matters more terrestrial, several other companies have had to restate because of errors in applying Topic 606, showing that it is far from simple to apply. *See, e.g.*, *Telos*, 2023 WL 1512207, at *1-2 (restatement resulted from failure to "record[] . . . revenue in accordance with ASC Topic 606"); *Gonzalez v. Cano Health, Inc.*, 2024 WL 4415216, at *2-4, 13 (S.D. Fla. Oct. 4, 2024) (same; dismissing securities fraud claim arising from the restatement); *Stein v. Bridgepoint Edu., Inc.*, 2020 WL 3250596, at *7 (S.D. Cal. June 15, 2020) (same). That Spire "was not alone in its mistaken interpretation of" a complex, technical accounting standard further undercuts an inference of scienter. *Medicis*, 689 F. Supp. 2d at 1207.

Also of note, when Defendants discovered that Spire's financials may have materially misapplied Topic 606, Defendants immediately notified investors in an August 14, 2024 filing, and then followed up with more information on August 27 and November 4. (¶¶ 33-37; *see also.* ¶ 129 (analyst report confirming that the "earl[iest]" Spire knew it may need to issue a restatement was "7.24.24").) At worst, Plaintiff's argument is simply that "in hindsight," Spire "made the wrong choice" in how to recognize revenue; but that is not enough to give rise to an inference of scienter. *Triangle*, 988 F.3d at 754.

### 4. The more compelling inference is that Spire made innocent mistakes, and promptly corrected them when they came to light.

Applying all facts holistically, the far more compelling inference is that Spire made innocent accounting mistakes, and promptly corrected them when they came to light. Dismissal is therefore required. Indeed, *Yates* practically compels that result.

In *Yates*, plaintiff's holistic scienter allegations were far more compelling than that alleged here: there were three detailed former employee statements that directly addressed the defendants' contemporaneous knowledge of the accounting errors, 744 F.3d at 886-89, "high

30

turnover of CFOs during the class period," *id*., "the firing of" defendant's outside auditor, *id*., and detailed "insider trading" allegations showing that "[s]ix Company insiders" sold over $12 million in shares during the Class Period, "as compared to" $7 million during the comparable period before the Class Period, *id*. at 890-91.

Nonetheless, the Fourth Circuit *still* held that "[c]onsidered holistically . . . plaintiff ha[d] not satisfied their burden" to allege scienter "under the PSLRA." *Id*. at 893. The "more compelling [] inference [was] that [] defendants were, at most, negligent." *Id*. That "management mistakenly—and perhaps negligently—failed to have sufficient accounting controls and processes in place" simply suggested that the company was "in over its head "when "applying a challenging new accounting standard." *Id*. The court further emphasized that "[t]he Company's successive disclosures" suggested an intent "to keep investors updated about [defendant's] internal weaknesses" as "management . . . gradually awakened to the magnitude of the Company's accounting problems and the cost of fixing them." *Id*. at 894.

The same result should follow here, because *none* of the things that were present and yet insufficient in *Yates*—a motive, contemporaneous knowledge of accounting errors, high turnover of CFOs, the firing of an outside auditor, and insider trading allegations—are present here. What's more, Spire is a relatively young company that went public only in August 2021. (Ex. 1 (2023 10-K) at 8; *see also id*. at 45 (noting that Spire is classified as an "emerging growth company," such that it is "exempt[] from various reporting requirements applicable to other public companies").) As noted above, the accounting issues that led to the restatement are complex, technical, and concern when to accrue revenue under lengthy performance contracts for sending satellites into space. *Supra* at 9-10, 30. That Spire struggled to "apply[] a challenging

31

new accounting standard" is thus a particularly cogent and compelling inference here. *Yates*, 744 F.3d at 893.

Nor is *Yates* an outlier. When faced with similar GAAP restatement allegations, other courts in this Circuit have likewise dismissed for lack of scienter. *See, e.g.*, *Telos*, 2023 WL 1512207, at *9 ("that accounting treatment of projected revenue was changed does not establish the required scienter"); *Knurr*, 272 F. Supp. 3d at 811 ("simply because corporate executives are 'in over their heads' with respect to an accounting problem does not mean that they commit fraud"); *Proter*, 2013 WL 1316034, at *9-*17 (same).[4] Just as in these cases, the only reasonable conclusion from the facts pled in the Complaint is that Spire was "at most, negligent," in how it accounted for pre-mission Space Services revenue and certain government contract R&D expenses during the class period. *Yates*, 744 F.3d at 893.

"[T]o hold otherwise would allow a plaintiff to simply contrast a defendant's past optimism with less favorable actual results, and then contend that the differences must be attributable to fraud." *Proter*, 2013 WL 1316034, at *17. Because the PSLRA "demands more," particularly with respect to scienter, and because the Complaint fails to meet that bar here, dismissal should follow. *Id.*; *see also KBC*, 19 F.4th at 613-14 (affirming dismissal for lack of scienter on facts far stronger than pleaded here).

---

[4] *See also, e.g.*, *Hertz*, 905 F.3d at 121 (affirming dismissal of securities fraud claim based on GAAP restatement, for failure to allege scienter); *Webb*, 884 F.3d at 855-58 (same); *Kohl's*, 895 F.3d at 939-40 (same); *In re Gold Resources Corp. Sec. Litig.*, 776 F.3d 1103, 1113-18 (10th Cir. 2015) (same); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (same); *Steinberg*, 2024 WL 1007879, at *19 (same); *Ixia*, 2015 WL 1775221, at *43-45 (same).

**II.    Plaintiff Fails to Plausibly Allege Loss Causation with Respect to Statements Related to Research and Development Expenses.**

The Court need not proceed further if it concludes that the Complaint lacks a cogent and compelling inference of scienter. But if it wishes to address more, the Court should also dismiss claims related to Spire's allegedly improper research and development accounting, *see* ¶¶ 80-88 (alleged "cost of revenue" misstatements), ¶¶ 90-98 (alleged "costs of research and development" misstatements), ¶¶ 100-08 (alleged "gross margin" misstatements) (together, the "R&D Statements"), for lack of loss causation.

To plead loss causation, a plaintiff must plausibly allege "that the defendant's misrepresentation . . . proximately caused the plaintiff's economic loss." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011); 15 U.S.C. § 78u-4(b)(4). In securities cases, a plaintiff usually does this is by alleging a "corrective disclosure," *i.e.*, a "release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud," and a "stock price drop[] soon after the corrective disclosure." *Meyer v. Greene*, 710 F.3d 1189, 1196-97 (11th Cir. 2013). Importantly, "[t]he disclosure must *"at least relate back to the misrepresentation* and not to some other negative information about the company.'" *Katyle*, 636 F.3d at 473 (emphasis in original). If a disclosure does not "reveal to the market in some sense the fraudulent nature of the practices about which a plaintiff complains," then it cannot have caused the stock drop that the plaintiff claims injured it. *Id*. Or to put things differently, if disclosure of the allegedly false statement does not cause any drop in the price of Spire's stock, there can be no causal connection between the fraud and the alleged loss.

Here, Plaintiff alleges that Defendants misled investors about *two* distinct accounting issues: Space Services revenue recognition, on the one hand, and R&D expenses related to certain government contracts, on the other. (*Compare* ¶¶ 45-48 (discussing former) *with* ¶¶ 49-53

33

(discussing latter).) Plaintiff claims that she suffered damages because the "truth" about Spire's accounting issues was "partially revealed" on "August 14, 2024"—when Spire disclosed that it could not timely file its Q2 2024 10-Q—and Spire's stock fell. (*Id*. ¶¶ 33-34, 116-18.)

With respect to the R&D Statements, this theory of loss causation is utterly implausible. *See, e.g.*, *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *27-28 (N.D. Cal. Mar. 10, 2023) (analyzing loss causation by "categories" of statements); *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *7-9 (S.D.N.Y. Sept. 30, 2013) (same). The August 14 disclosure revealed only that Spire was "reviewing its accounting practices and procedures with respect to . . . *certain contracts in its "Space as a Service" business (the "Contracts")* . . . and any related internal control matters associated with *the Contracts.*" (¶ 33 (emphasis added).) Potential issues with R&D accounting did not come up until November 4, 2024, when Spire disclosed a "[s]eparate" accounting issue with a *different* set of contracts—"certain research and development contracts . . . funded or co-funded by government agencies (the "R&D Contracts") (¶ 37.) As the Complaint concedes, it is *this* disclosure that first revealed the alleged "falsity" of Spire's R&D Statements, *not* the August 14 disclosure. (¶¶ 89, 99, 109.) Notably, though, Spire's stock did not fall upon the November 4 disclosure. (Ex. 33 (Stock Price Chart).) Thus, it was not a separate "corrective disclosure." *See Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7 (C.D. Cal. Feb. 6, 2014) ("press release" could not "serve as a corrective disclosure" where "plaintiffs d[id] not allege that [it] caused a drop in [defendant's stock] price").

The insurmountable loss-causation problem, then, is that "there is no logical connection between" the R&D Statements and the sole corrective disclosure identified in the Complaint. *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings, Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012). Nothing in the August 14 disclosure "even

34

inferentially suggest[ed] that" the R&D Statements "were fraudulent." *Katyle*, 637 F.3d at 475 (affirming dismissal of securities complaint on this ground).[5] And indeed, the "Loss Causation" paragraphs in the Complaint (¶¶ 116-18) do not even address the R&D Statements. Dismissal of claims based on the R&D Statements must accordingly follow for the additional reason that they do not plausibly plead loss causation.

## III.   Plaintiff Fails to Plead Control Person Claims.

Because Plaintiff fails to state a claim for a violation of Section 10(b), its Section 20(a) claims against the Individual Defendants (Count II) necessarily fail as well. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). Plaintiff will concede that if the Court dismisses the Section 10(b) claim, the Section 20(a) claim must go with it.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint. Further, because this case was filed over five months ago, and because Plaintiff has already filed two insufficient pleadings (*see* ECF No. 1, 57), the Court should dismiss with prejudice. *See Employ. Ret. Sys. of the City of Baton Rouge and Parish of East Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 381, 394 (4th Cir. 2023) (affirming dismissal of first amended complaint with prejudice); *KBC*, 19 F.4th at 607, 614 (same).

---

[5] *See also, e.g.*, *Bajjuri v. Raytheon Tech. Corp.*, 2023 WL 3650554, at *19 (D. Ariz. May 25, 2023) (dismissing claims where disclosure that a company had received a "DOJ subpoena" and was under "investigation" addressed a "different [business] segment," because plaintiffs failed to "connect the contracts associated with the DOJ investigation" to any misrepresentations); *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 445-46 (S.D.N.Y. 2021) (dismissing claims where alleged corrective disclosure "reveal[ed] nothing" about the specific misbehavior alleged in the complaint); *Hoang*, 2023 WL 6536162, at *28-*29 (same); *Plumbers*, 886 F. Supp. 2d at 338 (same).

Dated: January 22, 2025

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Jeffrey P. Justman*

Alison M. Agnew (VSB No. 90510)
1500 K Street, NW, Suite 1100
Washington, District of Columbia 20005
Telephone: (202) 842-8800
Facsimile: (202) 842-8465
alison.agnew@faegredrinker.com

Jeffrey Justman (*pro hac vice*)
Anderson Tuggle (*pro hac vice*)
Andrew McCarty (*pro hac vice*)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com
andrew.mccarty@faegredrinker.com

Timothy Katsiff (*pro hac vice*)
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
tim.katsiff@faegredrinker.com

***Counsel for Defendants Spire Global, Inc., Peter Platzer, Leonardo Basola, and Thomas Krywe***

36

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of January 2025, a true and correct copy of the foregoing Memorandum was served electronically via the CM/ECF system, which serves all registered users in this action.


*/s/ Alison Agnew*
Alison Agnew

37