UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


............................  :
                             :
                             : Civil Action
IN RE SPIRE GLOBAL, INC.     : No. 1:24-cv-01458-MSN-WEF
SECURITIES LITIGATION.       :
                             : March 14, 2025
                             : 9:53 a.m. - 10:28 a.m.
............................  :

TRANSCRIPT OF MOTION PROCEEDINGS
BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:       BUTLER CURWOOD PLLC
                          Paul Mark Falabella, Esquire
                          140 Virginia Street, Suite 302
                          Richmond, VA 23219

                          Kevin Francis Ruf, Esquire
                          *Pro hac vice*
                          1925 Century Park East, Suite 2100
                          Los Angeles, CA 90067

                          Rebecca Dawson, Esquire
                          *Pro hac vice*
                          230 Park Avenue, Suite 358
                          New York, NY 10169

For the Defendants:       FAEGRE DRINKER, BIDDLE & REATH LLP
                          (DC)
                          Alison Morgan Agnew, Esquire
                          1500 K Street NW, Suite 1100
                          Washington, D.C. 20005

                          Jeffrey Justman, Esquire
                          *Pro hac vice*
                          2200 Wells Fargo Center
                          90 South 7th Street
                          Minneapolis, MN 55402


(Continued)

(Continued)

|  | Timothy Katsiff, Esquire |
| For the Defendants: | *Pro hac vice* |
|  | One Logan Squire, Suite 2000 |
|  | Philadelphia, PA 19103 |

|  | Diane Salters, B.S., CSR, RPR, RCR |
| Court Reporter: | Official Court Reporter |
|  | United States District Court |
|  | 401 Courthouse Square |
|  | Alexandria, VA 22314 |
|  | Email: Dianesalters.edva@gmail.com |
|  | Telephone: (301) 338-8033 |

Proceedings reported by machine shorthand.  Transcript produced by computer-aided transcription.

Proceedings

THE COURTROOM DEPUTY: *In re Spire Global, Inc. Securities Litigation*, Case Number 24-cv-1458.  Will the parties please note their appearances for the record.

MR. RUF:  Good morning, Your Honor.  Kevin Ruf for Plaintiffs.

THE COURT:  Good morning.

MS. DAWSON:  Rebecca Dawson, also for the plaintiffs.

MR. FALABELLA:  And Paul Falabella, Your Honor.

THE COURT:  Good morning to you all.

MR. JUSTMAN:  Good morning, Your Honor.  On behalf of Spire Global, Inc. and the three individual defendants, I'm Jeff Justman from Faegre Drinker, and with me are my colleagues Alison Agnew and Timothy Katsiff.

MR. KATSIFF:  Good morning, Your Honor.

THE COURT:  Good morning to you all, and I commend you for being here early and ready to go.  I always like to start court early if we can, so I appreciate that.

This matter comes before the Court on Defendants' motion to dismiss, and the matter has been fully briefed, and I've reviewed the pleadings and the attachments, and I'm prepared to hear argument this morning.

Mr. Justman, I'll hear from you first, and you certainly don't need to repeat what's in the pleadings, but I will hear whatever you have to say, and I may interrupt you just to focus or redirect the discussion as we go on.

*Proceedings*

MR. JUSTMAN:  Great.  Well, thank you, Your Honor. Good morning, and may it please the Court.

We're here today on the Defendants' motion to dismiss. We've moved to dismiss, as Your Honor knows, because, in our view, the complaint does not adequately plead the essential element of scienter.  And as Your Honor knows, the standard for scienter in a securities case is higher than your typical Rule 8 standard under *Iqbal* and *Twombly*.  The plaintiff has to plead specific facts showing a strong inference that the defendants acted with the required mental state and intent to defraud.  And, here, where there's no motive alleged, Fourth Circuit cases say there's a correspondingly greater circumstantial evidence standard that the plaintiff has to surmount.

So in our view, this case begins and ends with *Yates*. If you read *Yates* and compare it to the allegations in the complaint, it's a straightforward case for dismissal.  *Yates* was an accounting restatement case about a company -- a mortgage company -- that the plaintiff said falsely represented was in compliance with an accounting standard.  The district court dismissed and the Fourth Circuit affirmed.  And if the Court compares the similarities between this case and *Yates*, it's a straightforward conclusion for dismissal.  Both accounting restatement cases both had an independent auditor sign off.  The plaintiffs alleged in that case that there were

Proceedings

accepted departures, that there was a core operations inference, that there was significant magnitude of the restatement.  And there were even things there that were stronger towards a conclusion of scienter.  There were multiple confidential witnesses.  There were allegations that the independent defendants actually were told, Yeah, your accounting treatment might be wrong; and there was a disagreement with their auditor about that.  There were suspicions, or at least allegations of, insider trading -- $12 million in stock sales -- and the auditor was alleged to have departed shortly thereafter.  Some of those are not even in this case, and the Fourth Circuit said, Even on that record, on those allegations, there isn't a cogent and compelling inference of an intent to deceive.  And the allegations here are much weaker, in our view, and so if you straightforwardly apply *Yates*, our view is you can dismiss the case and you don't need to apply the numerous other authorities that the parties cite in their briefs.

Of course, there are many other accounting restatement cases, Fourth Circuit cases, that affirm dismissals for lack of cogent and compelling allegations of scienter.  I don't need to re-walk the Court through those cases, but happy to answer questions if Your Honor has specific questions on specific parts of the doctrine.

THE COURT:  All right.  Well, help me understand the

*Proceedings*

mechanics of the restatement in this case.  So I understand, I think as best I can, the Space Services and the argument that the plaintiff makes about the subscription model -- and we're going to get into this, so we may as well talk about it because, as I understand it, the restatement has now come out; and, of course, this is not part of the pleadings and so it's not relevant to the determination before the Court -- but I am curious about sort of the state of things and your understanding of how these allegations are made regarding the violations of GAAP.

MR. JUSTMAN:  So I will answer that in the order the Court posed it.  So what's in the case, in the pleadings, is that in August of 2024, Spire filed a Form 12b-25 that said we can't file our normal quarterly report on time, and they gave some indication that this may be because of revenue recognition issues; and then later in August, they said, in fact, We're going to have to restate in the future, going back a period of time, because of issues with how one segment of Spire's business accounted for revenue from Space Services contracts.

Now, Spire has four different segments, including aviation, maritime, and weather.  This case is focused on just one of those segments, which is Space Services.  And it's really cool if you're a company and you want to customize hardware or software to get data about certain things that Spire tracks about the earth.  You can customize your own

*Proceedings*

satellite solution, and you can maybe even design and build and launch your own satellite. And the complaint alleges that the company publicly disclosed at the beginning of the class period, We're accounting for revenue from Space Services contracts on a milestone basis. So whenever, you know, there's a milestone in the contract for you design the satellite or you manufacture the satellite or you launch it, the company said, We are accounting for revenue on a milestone basis. That's paragraph 74 in the complaint.

And it came to light that maybe that was not the correct accounting standard. So Spire went back, worked with two Big Four auditing firms and said, Let's do this correctly, let's restate. The restatement has now come out. It came out on March 3rd, March 4th, but that was, obviously, after the plaintiff filed her initial complaint, and that was after the plaintiff filed her amended complaint.

And just to sort of cut to the bottom line, what I think was one question behind Your Honor's comments, Does the restatement matter; does it impact this motion or why we're here today? Our view is no for at least a couple of reasons. One, the record is on the basis of the plaintiff's pleadings. You don't judge our motion -- or what you should do on our motion based on what might come in the future. But even if they were to file, in the future, a motion for leave to amend based on a new development, based on the restatement, our view

*Proceedings*

is nothing in the restatement could possibly address the reasons we're here today, which is the element of scienter. The restatement addresses which things from prior filings might have been inaccurate or false, but it doesn't address any of the elements of scienter.

So to the extent Your Honor was asking does the restatement, you know, mean that I should deny the motion without prejudice or I should do something differently, our view is no; it has no bearing on that.

THE COURT:  All right.  Well, let me go back to the question I was trying to get at, which is really what the essence of this GAAP violation is.  And so what I heard you say is that there was an issue about when to recognize revenue based on the space-related contracts, and that some people just sign up and get a subscription for data that's being collected by the satellites as they are in orbit right now and some customers want something tailored to their specific interest, and that might require building something on the ground and sending it into space and then having a subscription in which they get the data after the new hardware, software has been launched physically into space, and that the defendant provides that entire solution; is that right?  In other words, they are capable of building the hardware, of putting it on whatever goes into space, of getting it set up, and then collecting the data; is that right?

*Proceedings*

MR. JUSTMAN:  That's correct.

THE COURT:  And when they do that, that client would pay them for all the different parts that get to the eventual point in time where that subscription of the data collection can go on into the future; is that right?

MR. JUSTMAN:  Let me answer it in two ways.  I don't think the complaint gets to that level of specificity, but to answer what I think is a matter of public record, and I don't think anyone would dispute, it's on a per-contract or per-customer basis.  So different contracts with different customers can mean different things.  Some customers subscribe for this period of time, a longer period of time.  Some customers subscribe for a shorter period of time.  Some customers might pay it all up-front.  Some customers might do it in any number of different ways.

THE COURT:  But when you say "subscribe," you're referring to a payment for data that's coming from the satellites, correct?

MR. JUSTMAN:  At a high level, yes.

THE COURT:  I'm asking about the point before that; in other words, all of the effort that has to be gone to to collect that data, if it is -- I think I saw somewhere in there the word "bespoke" -- if it's something that has been ordered specially by a client that can't be obtained simply by buying the subscription without the creation of some software and

*Proceedings*

hardware that's launched into space.  So I'm talking about that portion of it.

Spire is paid to build the hardware and software and to get it into space; is that right?

MR. JUSTMAN:  Well, yes, and I don't think the complaint gets into that level of granular detail about when specific payments are made, nor do I think that that's squarely relevant to the issues before the Court today because -- and let me explain why -- how payments are made and how subscriptions are done is totally different than how they're accounted for on a revenue recognition or GAAP perspective.  So I think -- and a lot of what the opposition papers do is say Spire or some of its individual officers talked about, We have a revenue-based model, or, We have a subscription model, and so they must have been aware of certain GAAP issues with how pre-mission -- pre-space mission activities were recorded from a GAAP perspective, and that's a disconnect.

So, of course, Spire talks about how its revenue works and, of course, its officers talk about how we have a subscription model in certain cases.  I don't think the complaint gets into more details than that, but that -- just because Spire talks about how its revenue model works or how its business model works from a subscription perspective doesn't mean that any individual defendant had knowledge or recklessly disregarded risks about how to record that revenue

from an accounting perspective.

THE COURT:  So now help me understand what they did originally and then what they've done now, realizing what they did originally was incorrect --

MR. JUSTMAN:  Yeah.

THE COURT:  -- with regard to the pre-launch or pre-space process.  That's what I'm trying to fully understand.  And I'll give Plaintiffs' counsel an opportunity to discuss it from their perspective as well.

MR. JUSTMAN:  And so I'll start with paragraph 74 of the complaint, and that talks about what I would call the "milestone approach."  So for these space contracts where there's different milestones, you first design something and then you manufacture it and you launch it, and the data comes in.  There's multiple milestones.  Spire candidly told investors in its annual 10-K forms, We are doing this on a milestone basis; it's subject to individual judgment, and maybe different contracts require different treatment, but that's how we're doing it.  And then when the issues came to light under ASC 606, the question is, Are those independent performance obligations, or are they what are called "mere preparatory activities"?  So from the accounting perspective, ASC 606 says if there's performance obligations, then you record the revenue when there's a performance obligation, and if it's a preparatory activity, like administrative work, then you don't

*Proceedings*

record it.  And the change in accounting treatment was, Well, for pre-space mission activities -- for designing or building or launching -- Spire doesn't actually have a performance obligation till the data comes to the customer.  So the decision was made to push, from a timing perspective, how revenue was recorded.  All the revenue is still there, and after the restatement came in, the same revenue under the contracts were reported, just in different time periods.  It was pushed later, in other words, to answer Your Honor's question.  So it went from a milestone approach to sort of at the end of when the last performance obligation occurred.

THE COURT:  All right.  Anything else you want to say?

MR. JUSTMAN:  So that's how it works.  But the core theme -- and we cite, probably, two dozen cases in recounting, account restatement, and even applying ASC 606, all dismissing or affirming dismissal -- and the common theme there is you can't just say, oh, you were an executive at the company or, oh, this was a core operation of the company.  You have to show facts showing that the defendants knew something was wrong and, yet, made contrary public statements anyway.  And there's no facts here showing that any individual defendant thought, You know what?  We shouldn't record it on a milestone basis; we should record it on a different basis.  There's no allegations of former employees or confidential witnesses.  There's no internal documents.  There's nothing that would even get you

*Proceedings*

close to there, and that's notably different than *Yates*.

In *Yates*, there were allegations that the auditor said, I think you're recording it wrong. And even then, the Fourth Circuit said, Well, the more compelling inference is that there was an honest disagreement. Here, there isn't even an honest disagreement. Here, the record evidence says the auditor approved everything. PwC, a top four auditor, approved the prior approach, so I don't know how you can get to an inference of scienter when you have no motive, no stock sales, approval from the auditor, and none of the other allegations that are found in those cases.

THE COURT: Now, there is a reference to a former employee, but as I understand it, the former employee is talking about a slightly different issue; that's the R&D issue. So tell me your view of how that fits in.

MR. JUSTMAN: Yeah. And if my answer to Your Honor's question seems repetitive, it's because *Yates* really addresses all these things. *Yates* addressed far more cogent and compelling allegations from former employees where they said, We told -- and I'm paraphrasing -- but they said things to the effect of, We told our higher-ups that there were issues with how we're addressing this accounting treatment, and the Fourth Circuit said, Those former employees, we're not going to give them -- we're not going to conclude that they give rise to an allegation or an inference of scienter because they're too low,

14

*Proceedings*

and it's not clear that they shared it with the individual defendants.  Here, you just have one former employee who is at least two levels below any individual defendant, and there's no allegation that he or she ever shared any concerns about how to classify research and development costs with any individual defendant.  So, in our view, *Yates* makes that one allegation of a confidential former employee essentially nil in the scienter analysis.

THE COURT:  But is your view that that former employee talking about how research and development is treated is directly related to the Space Services pre-launch issues or that --

MR. JUSTMAN:  No.

THE COURT:  -- could have been about some other portions of the business?

MR. JUSTMAN:  Yeah.  So to answer your question, no.  So there's two allegations here of false statements because of improper accounting.  One is how to recognize revenue for pre-space activities, which we've been talking about, and the other one, which was announced later, is how do you classify certain expenses for government contracts; are they research and development expenses or are they costs of revenue?  And the former employee only speaks to the latter category.

THE COURT:  All right.  Is there anything else you wish to add?

*Proceedings*

MR. JUSTMAN:  No, but I may have things to say in rebuttal.  Thank you.

THE COURT:  Mr. Ruf.

MR. RUF:  Thank you, Your Honor.  Again, I'm Kevin Ruf.

I'll start with the question you were asking -- well, I guess I'll start with the fact that, obviously, with a restatement having been filed a week and a half ago, that's obviously a lot of new information that, ideally, would be, at this point, in the complaint; and as you know, it's not.  Some of what I say, because I've been reading some of the information from the restatement, may be from that.  I'll try to be clear when I'm talking about the restatement.

But, to start with, the question you asked is a really good one with respect to exactly what happened with the recognition of revenue when the company -- and we have various citations to all the different times -- the company and the CEO, Mr. Platzer, was telling investors, Yeah, we're a subscription model; we get paid for the subscription.  You know, I think we quote, We don't get paid for anything else. So the real -- there's a question, and it's certainly not something that we were able to put forward in the complaint, but it is something that we may be able to give more clarity to as we review the restatement.

But the question is, with respect to scienter, is it

really a reasonable thing, when you know that you're getting paid for a subscription, to say, Well, we're going to start recognizing revenue for the stuff that we did before that? And, particularly -- and I don't think there's an answer; counsel certainly didn't answer it -- were they actually being paid up-front or were they being paid later but recognizing revenue up-front?  And if it is the latter, I think that that is giving rise to an inference, a strong inference, of scienter.

I'm sure you're aware, and we just heard it, there's a dispute with respect to whether our complaint alleges adequately the causation with respect to the R&D issue alongside the revenue recognition issue.  And, you know, I'll point out, and the complaint includes, the so-called corrective disclosure of August 14th; and in that August 14th disclosure when they were talking about recognition of revenue, they also said that there could be an impact on gross profit.  Well, if gross profit is the idea of, This is our revenue, and this is what it costs us to generate that revenue, the gross profit is the difference.  So if you're just shifting revenue to a different time frame, that shouldn't affect gross profit because the cost of that revenue, whenever you decide to acknowledge it, presumably, is the same.

And so when they said, in their corrective disclosure, this also could affect gross profit, we believe that that is

*Proceedings*

directly related to R&D.  And it turns out that, in fact, in their conference call talking about the corrective disclosure, the conference call that they had on March 4th last week, Basola, the CFO, said, Yeah, the reason, by the way, our profit margin is down by, literally, 20 percent as a result of this restatement, the reason for that is because of the R&D.  So we think there is a direct connection between the corrective disclosure that included a reference to gross profit and the fraud that we're alleging.

I think that covers what I wanted to bring up.  I will happily answer any questions as best as I can.

THE COURT:  All right.  I guess I'm still a little bit unclear on exactly what the allegation is here.  Do you agree or do you disagree with the defendants that this is really just about timing, it's not about recognition of revenue; in other words, that what they've identified as the problem when they announced that they needed to make a restatement wasn't about whether or not these contracts existed or whether or not the money was coming in; it was about the timing of when it was proper, from an accounting perspective, to recognize the revenue?  Is that what this case is about?

MR. RUF:  As to the revenue, it would appear so, yes.  But I would like -- and I had intended to, but didn't -- I would like to talk about the R&D issue.  You brought up the confidential witness, so-called former employee.  There were

some very specific things that that confidential witness said about the R&D.  In particular, there was an example of a $100,000 expense that was directly associated with a customer.

So to put this in perspective, many companies -- to give an analogy of a donut shop, let's say you have a donut shop, you sell donuts; that's your business.  On the side, you're developing a new donut machine.  So your business of selling donuts, you have gross profit, you have a profit margin.  That is, Okay, what does it cost us to make these donuts and sell them, and how much revenue do we get?  We subtract what it costs directly for making those donuts. That's our gross profit, and that's what most people would focus on looking at the value of that business.  Even if on the side, you're doing R&D to do something, you know, build a new machine, that might actually, ultimately, cost a lot of the money, and it might mean that the overall business doesn't make much money, but it's because of this R&D.

So it's often in the best interest of a company, if it wants to look good, to keep expenses on the just sort of generic operating side versus directly ascribing those expenses to the income, to the revenue they're generating.  And that's what we believe was done here, and we believe that the inference is strong that it was done intentionally because the company, over and over again, talked about how high their gross margins were.  But what it turned out that they were doing was

Proceedings

they were saying -- you know, R&D is a generic concept.  Now, my analogy was R&D would be research and development, you know, for the benefit of the company, but in this case, they literally sold R&D; it was a revenue stream, We are selling R&D, but they were essentially taking the expenses associated with that sold R&D, that revenue R&D, that service R&D, and they didn't count it against the income, the revenue.  Instead, they counted it generically against the company as just a general operating expense.

And that confidential witness says people certainly understood that they were doing that to gild the lily, that they were making the company look better by intentionally taking expenses that really should have been specifically ascribed to a revenue stream and, instead, making it an operating expense so that the revenue stream looked better in terms of the gross margin.

THE COURT:  All right.  Is there anything else?

MR. RUF:  No, Your Honor.  Thank you.

THE COURT:  Is there anything you wish to add?  It's your motion.

MR. JUSTMAN:  Just a couple of points if I may.

THE COURT:  You may.

MR. JUSTMAN:  Thank you.

So I understood my colleague on the other side to say this is all about subscription model, subscription model, and

we take all of that as true, but *Yates* says it doesn't matter if they're talking about a subscription model or how, you know, your company earns money or what the business model is.  I'm going to quote from *Yates*:  "Without additional detailed allegations establishing the defendants' actual exposure to the accounting problem, the complaint falls short of the PLSRA's particularity requirements."

You need to know about the accounting issue, how to recognize revenue or, in the other example, how to classify certain R&D costs.  There's no allegations in this complaint about that.

There was a lot of discussion about R&D expenses just now.  I think that's, candidly, a pivot.  If Your Honor looks at the scienter allegations in the complaint, there's almost nothing in there about R&D expenses or why a company or its officers might have knowledge or intent to defraud investors about how to classify certain expenses from government contracts.  That's just not in there.

And to conclude, right, if the implication of my colleague's argument is, Well, there's been a restatement, and we don't quite know what's out there, and we're still getting our arms around it, and we want to replead, Fourth Circuit cases -- and we cited some in our reply brief among others -- say you can't do that in an opposition to a motion to dismiss. You have to formally file a motion.  You have to show what the

*Proceedings*

amendment would be, and you have to explain why it would cure the deficiencies; and in our view, the deficiency is one of scienter.  So the restatement might address the particular metrics that were corrected, whether it's profit margins, expenses, costs, et cetera, but it doesn't address why there would be an intent to defraud.  And in our view, there are just no facts coming close to that standard.

THE COURT:  All right.

MR. JUSTMAN:  Thank you.

THE COURT:  This matter comes before the Court on Defendants' motion to dismiss the securities fraud class action for a failure to state a claim, and Defendants focus their argument, as we've just heard, on the question of whether the plaintiff has adequately pled that the individual defendants acted with the required scienter, that is, with fraudulent intent or severe recklessness as to the truth of their statements.

Under the PSLRA, in order for the complaint to survive a motion to dismiss, an inference of such intent must be not just available, but strong in light of competing innocent inferences.

The Court must consider the complaint and the relevant exhibits holistically, and to do so, must first determine whether the defendants' exhibits may be part of that consideration, and it finds that the law in the Fourth Circuit

*Proceedings*

is clear that those documents which the plaintiff has directly cited or quoted from in the complaint are incorporated by reference and are appropriate insofar as they provide additional context regarding the matters involved.

As for the other exhibits, the Court will take judicial notice of the Spire stock price since the plaintiff has not challenged its authenticity, but the Court will not, however, consider the SEC Form 4 exhibits and take those into consideration. It declines to do so because they are unnecessary to resolve the motion at this stage, and the plaintiff has, in its opposition, not alleged any insider trading or motive, for that matter, and so the Court finds that consideration of those documents is not necessary and consideration of the documents that are referenced in the complaint will not convert this into a motion for summary judgment, so the Court will consider this only as a motion to dismiss.

As for the merits of the scienter argument, the Court has examined the complaint's allegations holistically and considered all of the arguments that the parties have made for and against a strong inference of scienter. The Court finds that the facts supporting such a strong inference have not been sufficiently pled. The Court takes into consideration the various red flags that the plaintiff has alleged, including the reshuffling of the senior officers in the company, the

*Proceedings*

recognition of internal control deficiencies, and the nature of the accounting errors.  However, it also finds that each of these red flags is at least as consistent, if not more, with a finding of negligence.  This is especially true in the absence of any facts allowing for an inference that the defendants were specifically aware or should have known, if not for recklessness, that their accounting practices were not in compliance with GAAP.

While Plaintiff has pled statements showing that Defendants were familiar with the business model and cash flow for Spire's Space Services practices, the Court cannot infer from those statements that they should have been aware of exactly how those cash flows ought to have been booked for accounting purposes.

Accordingly, the Defendants' motion will be granted without prejudice.  The Court will grant leave to file an amended complaint within 30 days.  If that complaint is to survive, the plaintiffs must plead sufficient facts that would justify a strong inference of Defendants' awareness that Spire's accounting practices were not in compliance with GAAP.

And we had a discussion about those issues here this morning, and I'm mindful that the restatement was filed after this motion was fully briefed, but I would caution Plaintiffs to think carefully about filing an amended complaint, especially in light of *Yates* and the discussion of the parties

*Proceedings*

therein.  That is a case which involved significantly more detailed allegations that are absent in the amended complaint that the Court reviewed and has dismissed without prejudice at this time.

Are there any other issues the Court needs to address this morning on behalf of the plaintiff?

MR. RUF:  No, Your Honor.  Thank you.

THE COURT:  On behalf of the defense?

MR. JUSTMAN:  No.  Thank you, Your Honor.

THE COURT:  Thank you very much for your arguments, your briefing.  The Court has ruled.  Court will be in recess.

*        *        *        *        *

CERTIFICATE OF REPORTER

I, Diane Salters, hereby certify that the foregoing transcript is a true and accurate record of the stenographic proceedings in this matter.

/s/ Diane Salters

_____

Diane Salters, CSR, RCR, RPR
Official Court Reporter